# SIMPSON v. STODDARD COUNTY, Appellant; HIMMELBERGER v. COUNTY OF STODDARD, Appellant.

## In Banc, March 20, 1903.

1. **Swamp Land:** ACT OF CONGRESS: TITLE: RELATION. The act of congress of 1850, granting to Missouri in fee simple all the swamp lands embraced within her borders, the proceeds of which "whether from sale or direct appropriation in kind" were to "be applied exclusively, as far as necessary, to the purpose of reclaiming said lands by means of levees and drains," was a grant *in praesenti*, and vested the title of said lands in the State from the date of the act, and the patent issued by the Secretary of the Interior in obedience thereto related back to the passage of the act.

Simpson v. Stoddard County.

2. ———: VESTED IN COUNTIES: RESTRICTION ON SALE. The swamp lands were by the act of the General Assembly of November 4, 1857, vested "in full title" in the counties in which they lay, and by the Act of 1855 the several county courts were "authorized to sell and dispose of swamp lands within their respective counties, either with or without draining and reclaiming the same as in their discretion they might think conducive to the interests of said counties." Prior to the Act of 1868, there was no restriction of the sale of these lands to public sales by the sheriff. But by the Act of March 10, 1869, there was an unmistakable purpose to restore to the county courts the power of private sale which they had prior to the Act of 1868, and hence, a deed made in May, 1869, by a commissioner duly appointed for the purpose, in pursuance of a sale of swamp lands by the county court, was not void.

3. ———: SALE UNDER ACT OF 1869. By the Act of March 10, 1869, the counties were empowered to convey swamp lands just as they could any other lands owned by them, and the limitation as to the price of $1.25 per acre applied only to public sales by the sheriff, the county courts being authorized to sell such lands at private sales for less than $1.25 per acre. (Following Pool v. Brown, 98 Mo. 675, and Linville v. Bohanan, 60 Mo. 554, and overruling State ex rel. v. Crumb, 157 Mo. 545).

4. ———: HOW FAR HELD IN TRUST BY COUNTY: RESCINDING SALE. The swamp lands devised to the State by Congress in 1850, and by the State to the counties in 1855, 1857 and 1869, were not held by said counties under a trust which "ran with the lands." A county which has disposed of its swamp lands under said acts of the Legislature can not rescind its contract on the ground that it was a violation of the trust imposed by the act of Congress. It was entirely competent for the State to grant these lands to the several counties, either with or in disregard of the trust, and for the State to designate, which the act did, that the only trust, so far as the public schools were concerned, was upon " the net proceeds" of such lands after deducting all expenses and costs of drainage, reclaiming, surveying and selling the same. The State has full power to compel the counties to account for "the net proceeds" of the sales, but the county can not repudiate a sale made thirty years ago by the county court in conformity to the statutes, if no fraud is charged, although irregularly or defectively executed, on the ground that the price received was less than $1.25 per acre.

5. ———: COMMISSIONER'S DEED: REGULAR ON ITS FACE. If the county court had authority to appoint a commissioner to make conveyance of the county's swamp lands and his deed is regular upon its face, that deed is valid until set aside by appropriate proceedings. If his want of authority to make the patent was due to some compromise made by the county court, to which no reference was made in the

patent, and which was not required by law to be and was not recorded in the recorder's office, notice of such irregularities is not to be imputed to persons who have acquired from the patentee the title conveyed by the commissioner in the patent regular upon its face. Nor was it necessary, in such case, for the commissioner to recite the power under which he acted. (Distinguishing Sturgeon v. Hampton, 88 Mo. 203.)

6.  ———: ———: NOTICE: EXAMINATION OF COUNTY COURT RECORDS. Where the county court has authority to appoint a commissioner to make a deed to purchasers of the county's lands and his deed or patent is regular on its face, they are not required to investigate and examine the various orders of the county court authorizing such conveyance, unless there is some recital in the deed itself which would induce a prudent person to make such examination. Such orders of the county court are not muniments of title.

7.  ———: ORDERS OF COUNTY COURT. A county has no standing in a court of equity after thirty years to question the validity of orders of the county court out of which grew the sale by a commissioner of lands belonging to the county.

8.  Laches: APPLICABLE TO MUNICIPALITIES. The doctrine of laches applies to a county or other municipal corporation, the same as to individuals.

9.  ———: COUNTIES: THE DOCTRINE. Where a county court is charged by law with the performance of certain duties in reference to a particular subject-matter, and that court undertakes, in good faith, to execute its powers, but fails to observe certain requirements of law, so that its acts in that regard are irregular, such acts, if acquiesced in, will become binding upon the counties as completely as if they had been regular and in strict conformity to legal prescription. But if the Legislature has never conferred upon the county court the power, and the court nevertheless undertakes to exercise it, no subsequent action of the county can ratify the unauthorized act of the court.

10.  ———: ———: SWAMP LANDS: ESTOPPEL. Where the Legislature authorized the county court to sell the county's swamp lands and the court undertook to do so more than thirty years ago and has since acquiesced in the sale, it is but exercising the power conferred upon it by the Legislature, and is estopped to question the regularity of the sale, whether the law gave the court the power to sell the lands by public or private sale, or at a price less than $1.25 per acre.

11.  ———: ———: ———: PAYMENT BY COUNTY WARRANTS: INNOCENT PURCHASER. Nor will the fact that the lands were paid for by county warrants which at the time were worth only thirty or forty cents on the dollar, affect the equities of such a holding, for in the hands of the county these warrants were worth par. Especially should this

be the holding if the school board is not a party to the proceeding. And in any event this must be the ruling in a proceeding against innocent purchasers from the patentee, if the county's patent did not disclose that the payment was made in county warrants.

12. ————: ————: ————: NECESSARY PARTIES. The county is the only necessary party to a proceeding to set aside a sale by the county court of the county's swamp lands.

13. ————: ————: ————: RATIFICATION: CONDUCT AND DELAY: ESTOPPEL: LACHES. A county court authorized by law to sell the county's swamp lands, sold them at private sale, and for more than thirty years acquiesced therein, the commissioner's patent disclosing no infirmities on its face and containing no recitals that would induce a prudent man to look further for muniments of title. The patentee sold them to defendants, who placed their deeds of record and have had such possession as the lands were susceptible of, and have at all times claimed to be the owners, and have been regularly assessed for taxes, which they have paid. The county brings suit to set aside the commissioner's deed, but does not offer to return the money originally received for the lands. *Held*, that, if the county has any rights in lands growing out of the irregularity of the sale, her long silence, her acceptance and retention of the money paid her, her continuous acceptance of taxes and efforts to enforce the collection of taxes levied, now estop her by reason of laches from asserting such claim.

14. Swamp-Lands: POWER OF LEGISLATURE OVER: COUNTIES. A county is a mere subdivision of the State; it is simply a part of the State; and all its powers and duties are derived from the Legislature and are to be exercised in subordination thereto. It holds the swamp lands lying within its borders in subordination to the power of the State, which may change, as occasion may require, the method by which the county may dispose of them.

15. ————: ————: ————: IRREGULAR SALE: LEGISLATIVE CONFIRMATION. If the county has exercised in an irregular way the power vested in it by the Legislature to sell its swamp lands, the Legislature may, by special act, render its acts valid, by way of legislative confirmation, if by doing so no vested right of individuals is interfered with.

16. ————: ————: ————: ————: ————: SWAMP LAND: ACT OF 1901. The Swamp Land Act of 1901, providing that "in all cases where the county courts of this State have, prior to 1880, sold or disposed of any swamp lands in their respective counties, and issued or caused to be issued patents for the same, and the patentees or those claiming under them have been claiming such lands and paying county and State taxes thereon for more than twenty years, such grants shall

be deemed and held to be good and valid," does not impair any vested rights of individuals, nor undertake to validate void instruments, but is based on equitable grounds, its purpose being to render valid the acts of a political subdivision of the State which derived its powers from the Legislature and to cure any irregularity or informality in the attempted execution of that power. It does not make valid a patent that recites a consideration that would make it void. That act is valid.

17. ———: ———: ———: ———: ———: ———: PASSED AFTER APPEAL: INVOKABLE. That act may be invoked on appeal from a judgment rendered before its enactment.

18. **Applicability of Act Passed After Appeal.** If, subsequent to a judgment in the trial court and before the decision in the appellate court, the Legislature passes a curative act which positively changes the rule which governed at the trial, that act, if valid, must be obeyed by the appellate court in disposing of the appeal.

PER BRACE, J., DISSENTING, ROBINSON, C. J., AND MARSHALL, J., CONCUR RING WITH HIM.

1. **Swamp Lands: SALE BY COUNTY COURT.** Under the Act of 1868 swamp lands could only be sold by the sheriff, at public sale, on sixty day's notice, for not less than $1.25 per acre, by order of the county court. The county court had no authority to authorize them to be sold to be paid for in county warrants. And a sale by a commissioner in pursuance to such an order was void.

2. ———: COUNTY AS TRUSTEE: TRUST RAN WITH LAND. The swamp lands were vested in the county to be sold at not less than $1.25 per acre, the proceeds to be held for the use of the public school fund, and this trust as to the county ran with the lands.

3. ———: GENERAL JUDGMENT: AGAINST COUNTY. The holder of a deed to swamp lands from the county founded on a general judgment against the county, can not show by parol evidence that such judgment was founded upon "swamp land script" or warrants issued by the county for constructing a levee and drains.

4. ———: ———: PAID BY SWAMP LANDS. The swamp lands were never the property of the county, nor subject to its obligations as a county, and could not be sold to pay a general judgment against the county, nor could the county court trade them off in payment of any general judgment against the county. And any deed made by the sheriff for such purpose is void.

5. ———: LIMITATIONS OF COUNTY POWERS: NOTICE. All persons are required to take notice of the limitations of the powers of a county court, and that all acts done by it in excess of such powers are void.

6. ———: ———: LACHES. The doctrine of laches is not applicable where the person invoking it claims under a deed, from a county, which is void because the county had no power to make it.

7. ———: ———: ———: TAXES: ESTOPPEL. Nor is the county estopped from asserting such deed to be void by reason of the fact that for more than twenty-nine years the patentee therein, and those claiming under him, have paid taxes assessed against the lands.

8. ———: ACT OF 1901. The Act of 1901, concerning swamp lands, can not on appeal be invoked in aid of a judgment of the circuit court rendered before its passage.

Appeal from Stoddard Circuit Court.—*Hon. J. L. Fort,* Judge.

AFFIRMED.

*Mozely & Wammack* for appellant.

(1)   The lands in controversy could be disposed of only in the manner prescribed by law.   State ex rel. v. New Madrid County, 51 Mo. 82; School Fund v. Crumb, 157 Mo. 561.   (2) The county court of Stoddard county was powerless to avail itself of the provisions of the Act of March 10, 1869, at the date of the Eltzroth compromise, for the reason that the patent provided for in said act had not been executed and delivered to the county.   Section 1 directs the preparation of patents for the purpose of conveying all the title and interest of the State in and to said lands to the county.   Section 6 provides that such lands as have been patented under the provisions of this act may be sold as other lands belonging to the county.   The county of Stoddard did not have title to said lands under the Act of March 10, 1869, prior to the execution and delivery of the patent above mentioned, and, hence, could not convey title under said act prior to said time,   In addition to the foregoing this court has explicitly decided that, "the Act of March 10, 1869, did not divest or destroy the trust upon which the county held the lands, nor did it change the manner of selling the same nor remove the limitation as to sell-

ing the same for not less than $1.25 per acre within five years after January 1, 1866.   Its only effect was to authorize the county to issue the patent instead of the State.''   School Fund v. Crumb, 157 Mo. 562; State ex rel. v. New Madrid Co., 51 Mo. 85; Sturgeon v. Hampton, 88 Mo. 203; Railroad v. Hatton, 102 Mo. 55; Railroad v. Wayne Co., 125 Mo. 351; Hooke v. Chitwood, 127 Mo. 372; State ex rel. v. Wayne Co., 98 Mo. 366. Hence, it is clear that the Act of March 27, 1868, is the only law respecting these lands which was in force at the date of the Ringer judgment and sale and the Eltzroth compromise and that section 3 of said act provided the only manner in which said lands could be sold from January 1, 1866, to January 1, 1871, a period of five years.   School Fund v. Crumb, 157 Mo. 562.   (3)   If the sale under the Ringer judgment is void, and the county court had no power to make the Eltzroth compromise, there is no basis for respondent's claim of title. No person has ever contended that the sale under the Ringer judgment, or the compromise effected by the county court with the grantees at said sale, known as the Eltzroth compromise, was effectual for the purpose of passing the title of the lands.   On the contrary it has been expressly decided by this court that both of these transactions were absolutely void; the one because trust property could not be taken to satisfy a general judgment; the other because the county court had no power to make the compromise.   School Fund v. Crumb, 157 Mo. 562; Stone v. Perkins, 85 Fed. 618.   And this doctrine is not in conflict with the opinion in the case of State ex rel. v. Butler County, 164 Mo. 214, wherein the money arising from the sale of the swamp lands of that county was subjected to the payment of a general judgment.   The statute of 1895 specifically subjects money arising from the sale of such lands to the payment of attorney fees, and, hence, it was unnecessary to have a special judgment against the fund.   Laws 1895, p. 44. (4)   The test in applying the doctrine of estoppel to a county is, did the county, in doing a particular act which

is to operate as the basis of the estoppel, act within the limits of any power conferred upon it by law? If so, the county should be estopped; if not the doctrine does not apply to the county. Dunklin Co. v. Chouteau, 120 Mo. 577; Boone Co. v. Railroad, 139 U. S. 684. So far as the case at bar is concerned, neither laches nor limitations will aid respondents. The superstructure of title they seek to build upon these supports rest, and must ever rest, upon the crumbling foundation of an absolutely void act. School Fund v. Crumb, 157 Mo. 564. (5) The Constitution of this State provides: "The General Assembly shall not pass any local or special law legalizing the unauthorized or invalid acts of any officer of any county." Art. 4, sec. 53, Constitution. The curative Act of 1901 is a special law designed for a special purpose. It undertakes to validate patents issued by county officials. This act does not amount to an independent grant of the lands; it says the grants made by the county courts prior to 1880 shall be valid; hence, if the grant of the county court of Stoddard county, effectuated by the Eltzroth patents, was void because made in violation of law, it is void yet, unless said act makes it valid; if said act makes the grant valid, as it recites, then it clearly makes valid the void act of a county officer and contravenes the above-quoted section of the Constitution. The act of the county court known as the Eltzroth compromise is either valid or void; if valid, the title to the lands is in the patentees without reference to said act; if void, the title is in Stoddard county as trustee, notwithstanding said act. Sturgeon v. Hampton, 88 Mo. 215. It is true that the Legislature has never parted with its control over these lands; it may take them from the county where the title has not already passed to others and may donate them, we think, or authorize the county to donate them, in aid of any purpose designed for the public good, but it can not even by an independent grant donate the lands to individuals.

*J. F. Shepley, L. F. Dinning, J. J. Russell* and *Martin L. Clardy* for respondents.

(1)   On its face, the Ringer judgment is a general judgment against the county, but it appears from the evidence referred to in the above statement that plaintiff's petition was founded on certain certificates of indebtedness known as "swamp land script," which were filed therewith; that these had been issued for work and labor done under contract with the superintendent of public works for Stoddard county.   Stoddard county was not indebted to the persons who performed labor in the matter of leveeing and ditching; therefore, no obligation rested upon it to pay the certificates of indebtedness.   The evident purpose of the plaintiff was to subject the swamp lands to the payment of a debt contracted in their behalf.   (2)  Whatever may be said of the title acquired at the execution sale, it was within the power of the county court to make the contract and sell through its special commissioner the lands, as it did at its April term, 1869.   At the time the compromise or private sale was made by the county, the act, approved March 10, 1869, was in force, and it is clear that this statute was before the county court and that that court undertook to act in pursuance of it.   Section 6 gives to county courts authority "to sell and dispose of the same in like manner and with like effect as now provided by the general statutes in relation to the conveyance of other real estate belonging to their respective counties."   The general statutes in force at that time contained the following provision:  "Section 9.   The said courts [county courts] shall moreover have the control and management of the property, real and personal, belonging to the county; and shall have full power and authority to purchase or receive by donation any property, real or personal, for the use and benefit of the county; to sell and cause to be conveyed any real estate, goods or chattels belonging to the county, appropriating the pro-

ceeds of such sale to the use of the same, and to audit and settle all debts against the county." G. S. 1865, p. 556. Accordingly, it has been held: "A deed to swamp land executed by the swamp land commissioner in pursuance of a sale made by order of the county court after the land has been patented by the State to the county, will pass to the grantee the title of the county." Prior v. Scott, 87 Mo. 303. To the same effect: Pool v. Brown, 98 Mo. 684; Hall v. Gregg, 138 Mo. 286. What is said in appellant's brief of the limitations placed upon the county courts in dealing with swamp lands has no application to this case for the reason, as respondents insist, that the powers of the court defined by law have not been exceeded. The oft-repeated statement in the opinions of the court, that, "The county courts, in disposing of swamp lands, are but the agents of the counties with powers limited and defined by law," can not affect a case where the law has been observed. It is not contended by the respondents that the lands involved in this suit were the general property of the county, and it is admitted that they were held for the uses provided by law, but it is contended that the county had the right to dispose of the land at private sale for less than $1.25 per acre at the time plaintiffs' remote grantors purchased the same, and that the county can not impeach the conveyances made by it. (3) The county justices and the other officers of the county were advised that these lands were for sale by the purchasers from the county, and had both constructive and actual notice of the sales after they were made. There has been no time since the sale in 1869 that plaintiffs and their grantors have not been in such possession as could be taken of the lands, and the county admits they "have exercised acts of ownership over said lands" ever since they purchased them. "It is well settled that the doctrine of laches applies to a county or other municipal corporation, as well as to individuals." Dillon on Municipal Corporations, sec. 548; Dunklin

County v. Chouteau, 120 Mo. 594; State ex rel. v. West, 68 Mo. 229; County v. Post, 93 U. S. 502; County v. American Emigrant Co., 93 U. S. 124; Huff v. Buchanan, 27 Fed. 328; Murphy v. Packer, 152 U. S. 398; Boone County v. Railroad, 139 U. S. 684; Railroad v. Dist. of Columbia, 132 U. S. 1.   (4) On March 14, 1901, the Legislature passed an act to quiet the title to swamp and overflowed lands.   The swamp lands do not belong absolutely to the county.   In their disposition the county courts do not act independently of the authority of the State.   Barton Co. v. Walser, 47 Mo. 189.   The county's very existence may be determined if the State shall so decide.   The power of the Legislature to enact the statute of 1901 can not be questioned.   Barton Co. v. Walser, supra; State, etc. v. Co. Ct. St. Louis Co., 34 Mo. 546; Connor v. Bent, 1 Mo. 235; Railroad v. Marion Co., 36 Mo. 294; Cooley on Const. Lim., 240.

*Henry N. Phillips* for State Board of Education for the Fourteenth Congressional District, on rehearing.

(1) It is by section 6 of the Act of 1869 that respondent hopes to win, for in discussing this section in his motion for a rehearing, he says "that it implies that the county could sell at private sale and for any price" the lands involved, and that "commissioner Eltzroth's deed" was sufficient to pass all the county's title to the purchaser.   Laws 1869, sec. 6, p. 67; Laws 1869, sec. 3, p. 66; Laws 1874, sec. 1, p. 101; G. S. 1865, sec. 3, p. 278; R. S. 1879, sec. 6209; R. S. 1889, sec. 6515; R. S. 1899, sec. 8249; State ex rel. v. New Madrid County, 51 Mo. 85; Sturgeon v. Hampton, 88 Mo. 211; Railroad v. Hatton, 102 Mo. 55; Dunklin County v. Chouteau, 120 Mo. 594; Railroad v. Wayne County, 125 Mo. 357; Moss v. Kauffman, 131 Mo. 429; State ex rel. v. Crumb, 157 Mo. 562.  "The only effect of section 6 of the Act of 1869, was to authorize the county to issue the patent instead of having it issued by the State."   Simpson v. Stoddard County, opinion by Court in Banc.; State ex

rel. v. New Madrid County, supra; State ex rel. v. Crumb, supra. The foregoing cases must effectually explode the idea that Stoddard county had, under the Act of 1869, power to sell at private sale, and for any price, the swamp lands of that county, and also explodes the contention that the Eltzroth compromise and the patent made in pursuance thereof, validated respondent's title upon the hypothesis that such compromise and patent was equivalent to a private sale under that act. (2) The conditions prescribed by the Legislature as to the manner of selling swamp lands by county courts are in the nature of conditions precedent, and must be strictly observed in selling such lands before the title will pass from the county to the purchaser. These conditions being created by general laws, impress upon the land a trust that runs with it, and of which all persons dealing with them must take notice. State ex rel. v. New Madrid County, supra; State ex rel. v. Crumb, 157 Mo. 558. (3) Respondent says, in his motion for a rehearing: "But, if the sales of those from whom the plaintiffs derived title were void or so irregular that they could not be validated, and if the county can not be barred by limitation, or affected by laches, it does seem that they may invoke the curative Act of March 14, 1901." Our first proposition under this point, waiving at this time the question that the statute is unconstitutional, is that it is a most vicious character of legislation, and just such legislation as ought to meet with emphatic discouragement from the judiciary of the State. (a) It seeks to make valid patents admitted to be void under the law, provided the patentees or those claiming under them have simply paid the taxes on the land involved for more than twenty years; and it is open to the objection that no reason is given in the act why the year 1880, rather than 1870 or 1860, or, as for that matter, any other year after February 3, 1865 (the date of the act donating the swamp lands to the county), up to the passage of this act, is selected as the

date beyond which the title to the swamp lands is to be quieted. We merely suggest that the year 1870 would have been an unfortunate year to have named in the act, as the Eltzroth patents were foisted upon the public that year, and the authors of the bill saw to it that 1870 should not appear in the act. (b) The act was introduced and its passage secured for the specific purpose of avoiding the effect of the decision in the Crumb case, and to make valid the Eltzroth patents, and other like patents, issued without authority, which by this court have been declared void. (c) The quality of the act and the time of its introduction and passage, show that its real author carefully adjusted it to the circumstances of the case at bar, as well as the Crumb case (the land being the same in both cases) by crystallizing the fact of the payment of taxes on such land by the claimants thereof, into a legislative grant of title, notwithstanding this court had held that these claimants had no title whatever to such lands; and notwithstanding also that the act amounted to an abrogation, in such special cases as it might be made applicable, of the most ancient doctrines of law or equity. Hence, the act is the grossest kind of class legislation, being enacted in the interest of those who would rob the school fund of the different counties for the purposes of speculation merely, and is against the interest and honest purposes of those who have bought this land in good faith, made their homes upon them and are instrumental in the building up of this country. (d) It undertakes to legislate a public trust fund (belonging to the county school fund) into the hands of a third party, who has no legal or equitable title thereto, and because it divests from the school fund, and without any kind of compensation therefor, a right vested in the school fund by every act of the Legislature from March 3, 1851, being the date of the first law donating the swamp lands, the Constitution of 1865 and the Constitution of 1875, up to the passage of this act. This is the first effort, in fifty

years, made directly asking a gift to private individuals, and they non-residents, of these lands. The fact that they have paid taxes twenty years cuts no figure, as the meagre and insignificant amount of taxes paid on these wild lands does not amount to the thousandth, yea the ten thousandth part of the timber sold from them. (e) Its very language is, "That no action shall be maintained for the purpose of setting aside or calling in question such patent or patents," thereby closing the doors of the courts against any person litigating the question of the invalidity of such patents, however fraudulent they might be. Our second proposition is that the act is unconstitutional. (a) Because retrospective, for it reaches back and gives to a void transaction a different legal effect from that which it had under the law when it took effect. (b) Because it denies to every person the right to contest the invalidity of the patents issued by counties for swamp lands, which is depriving such person of a vested right, the right to sue. (c) Because it perverts a public trust fund into the hands of private parties, which, by the Constitution and laws of the State, is required to be sacredly preserved and protected for the benefit of posterity. (d) Because it is special and class legislation, as it relates only to persons who have swamp lands and have paid taxes thereon for more than twenty years. (e) It is open to the further objection that the act provides no time wherein any person who may have obtained an honest patent to any of these lands could bring suit to quiet title. This is the only act of this kind in the United States. The shortest time ever given by any Legislature in such case, was given by the Legislature of Wisconsin, which was ten months. In the case of Cranor v. School District, 151 Mo. 125, Judge BURGESS says: "As there was no time given in the act in which actions then accrued might be brought after it took effect, as to all such actions it was and is unconstitutional." Again, on page 124, same case, Judge

BURGESS said: "In the case of Stephens v. St. Louis National Bank, 43 Mo. 388, it is said: 'Limitation acts are based on the idea that the party has had an opportunity to try his rights in the court. A statute which should bar the existing rights of claimants, without affording that opportunity, after the time when the statute should take effect, would not be a statute of limitations, but an unlawful attempt to extinguish rights and destroy the force of contracts. It is essential, therefore, to their validity, that they allow a reasonable time, after they are passed for the commencement of suits upon existing causes of action.' Citing Price v. Hopkins, 13 Mich. 318; Call v. Hagger, 8 Mass. 423; Society v. Wheeler, 2 Gall. 141; Blackford v. Pielter, 1 Black. 36; Thornton v. Turner, 11 Minn. 339; Berry v. Ransdall, 4 Net. (Ky.) 292."

*John F. Shepley, L. F. Dinning, J. J. Russell* and *Martin L. Clardy* for respondents, on rehearing.

(1) Following the case of State ex rel. v. Crumb, 157 Mo. 545, this court holds that the judgment in favor of Ringer against Stoddard county was void because as it is stated, "it is founded on a personal debt of the county, and the effect of the sale under it was to make the school lands pay the county's indebtedness." The judgment, on its face, is a general judgment, but it is not understood how the court can conclude from the evidence that the school lands have been made to pay a debt due from the county. In the order of compromise of April 23, 1869, it is recited that, "At the March term, 1868, of the circuit court of Stoddard county, in the State of Missouri, Louis M. Ringer obtained a judgment against Stoddard county upon warrants of the swamp land fund of said county." The county, speaking through the county court, thus negatives the assumption that the judgment was founded on a personal debt of the county. While the county had no right to speak

a falsehood, it did have the right to speak the truth respecting its relation to the suit of Ringer v. The County, and its statement, made by the tribunal which could alone represent the county, that the Ringer judgment was against the swamp lands for work and labor done in reclaiming them, ought, at least, to cause the court to modify the expressions, several times made in the opinion, that the judgment was "A personal judgment for a personal debt of the trustee," and "The effect of the sale was to make the school lands pay the general indebtedness of the county." (2) The whole policy of the law, since the Act of 1869, has been construed to be that the counties, in the disposal of swamp lands, may exercise the same discretion that they use in disposing of the county lands proper, and it has not been believed that, in doing so, they violate any of the principles announced in the cases of State ex rel. v. County Ct. of New Mad. Co., 51 Mo. 85; Sturgeon v. Hampton, 88 Mo. 203; Railroad v. Hatton, 102 Mo. 55; Railroad v. Wayne County, 125 Mo. 351; Hooke v. Chitwood, 127 Mo. 372; State ex rel. v. Wayne County Ct., 98 Mo. 366. (3) It is admitted that respondents and their grantors have exercised acts of ownership over the lands involved in suit, and paid the taxes thereon since the execution of the patents by Eltzroth in 1869, now thirty-two years ago. On several occasions, the board of equalization of the county, composed in part of the justices of the county court, has cited the plaintiffs, as the owners of the property, to appear before it and to show cause why the taxes on their lands should not be increased. The taxes have been increased from time to time. One of the plaintiffs, the taxes on some of the lands having become delinquent some years ago, was cited to appear, and the county, as a consideration for his paying such delinquent taxes, made him another patent which recited that the amount paid, together with the amount originally paid to the county on the compromise sale, equaled, or exceeded, $1.25 per acre; and it

may not be out of place here to remark that the county has received in taxes on the land more than $1.25 per acre, saying nothing about the purchase price paid in 1869. Not an acre of the 107,000 acres of land sold in 1869 is now owned or claimed by an original purchaser from the county. Long before the plaintiffs, who now own less than 11,000 acres in the county, made their purchases, it was known by the justices of the county court and all the other officers of the county, and was a matter of public notoriety, that the lands were for sale in small tracts, and were selling. The possession of plaintiffs' grantors and of plaintiffs since their purchases has not been a concealed possession, and there has been no time since 1869 that the agents of the county could not know and did not know of such possession, by reason of the surveys of the ground every time a sale was made, by the surveyor of the county, and by reason of the efforts to protect the remaining lands from spoliation. The possession, which has been deemed sufficient in other cases to give title by limitation to uncultivated lands, was present in this case; but the opinion holds that the defendant county can not be estopped by any acts of its agents, and that the doctrine of laches has no application in this case for the reason that the county is a trustee of these lands, and a number of cases are referred to in support of that proposition, which, it is respectfully submitted, do not support or tend to support it. The principle of the opinion would apply, not only to the lands involved in this suit, but to the 107,000 acres of lands, and to millions of acres of other lands that have been sold substantially as these lands were sold. It does not seem that the fact that the doctrine of laches applies to a county, as well as to individuals, ought to be longer disputed. State ex rel. v. West, 68 Mo. 229; Boone County v. Railroad, 139 U. S. 684; Railroad v. Dist. of Columbia, 132 U. S. 1; County v. Am. Emigrant Co., 93 U. S. 124; Hough v. Buchanan, 27 Fed. 328; Murphy v. Packer, 152 U. S. 398; Oxley Stave

Co. v. Butler Co., 121 Mo. 614; Sanders v. Devereux, 60 Fed. 311; Am. Stave & Cooperage Co. v. Butler Co., 93 Fed. 301; Rummel v. Butler Co., 93 Fed. 304.

FOX, J.—These cases originated in Stoddard county, Missouri. The questions involved in both cases, being practically the same, they were consolidated by agreement of the parties, with the consent of the court, and tried as one case.

The suits in these cases were instituted to quiet title to certain lands set out in the petition, located in Stoddard county, Missouri. The lands involved in this controversy are what are known as swamp or overflowed lands. The petitions in the two cases, as well as the answers, present practically the same questions, and there being no point presented for review upon the pleadings, we will not burden this opinion by inserting them. There is no dispute as to the facts, other than upon the character of the claim of Ringer against Stoddard county. As to that, there is a conflict of testimony as to whether his cause of action was an ordinary claim against the county or upon warrants upon the swamp land fund. We regard this dispute as to the nature of the cause of action in the suit of Ringer against the county, as being immaterial as to the vital questions involved. At least, we have concluded that a conclusion reached upon one side or the other, upon this disputed question, would shed but little light upon the main points of difference in this cause.

On March 13, 1868, Lewis M. Ringer obtained a judgment against Stoddard county for $1,136.90, and in August following caused an execution to be issued and levied upon 107,000 acres of land, the same being swamp and overflowed lands conveyed by the State of Missouri to Stoddard county for the purpose of reclamation and drainage, as set out in the act of conveyance; had the land sold under the execution, and at said sale, the plaintiff's grantors purchased the land in controversy in this

suit. At a special term of the county court, held in April, 1869, the court entered an order of record compromising with the purchasers of said land at the sheriff's sale, which order of compromise made by the county court of Stoddard county is as follows, to-wit:

"Whereas at the March term, A. D., 1868, of the circuit court of Stoddard county, in the State of Missouri, Louis M. Ringer obtained judgment against Stoddard county upon warrants on the swamp land fund of said county, upon which said judgment an execution issued according to law, by virtue of which said execution the sheriff of Stoddard county did seize and levy upon all the swamp land owned and possessed by said county, of which said lands so levied upon one hundred and seven thousand or near that amount of acres of said lands were sold by said sheriff in due accordance of law at the September term of the circuit court of Stoddard county, A. D. 1868, to Louis M. Ringer and others; and whereas, the county court of Stoddard county, did at its February term, A. D. 1869, by an order of record, appoint William G. Phelan and David G. Hicks, attorneys for and on behalf of said county to institute suit for the recovery of the lands sold as aforesaid, granting to them the interest of the county to fifty thousand acres of the lands so sold, as their fee. Now, therefore, in consideration of the facts that said suit would be attended with much uncertainty in the recovery of said lands and require years of litigation to terminate the same, it is therefore considered by the court that a compromise of the same would be for the benefit of the said county of Stoddard if made with the parties who bought said lands at said sale, whose names are as follows, to-wit: Louis M. Ringer, D. Starks Crumb, Erastus W. Hill, Thomas W. Johnson, Samuel J. Bartlett, I. Frank Starrs, Robert W. Carter, M. E. Leach, William P. Knox, Clarissa M. O'Dell, H. H. Bedford, James Frazier, William W. Norman, J. Moore, J. E. Liles and Jesse B. Leggett; and whereas, said purchasers agree

and covenant to pay to the said county the sum of thirteen thousand five hundred dollars in Stoddard county warrants, which sum is to be paid into the county treasury on the following terms and in the following manner, to-wit: said parties either paying as aforesaid or executing their promissory notes, bearing six per cent interest, one-half of said sum shall be paid as aforesaid on or before the first day of January, A. D., 1870, and the remaining half on the first day of January, A. D., 1871. Each of said parties giving notes for their portion of said sum shall secure the same by mortgage on real estate to the satisfaction of the county court of the said county. Therefore, it is considered, adjudged, ordered and decreed, that in consideration of the premises aforesaid, the county court shall and will cause letters patent to be issued to the purchasers of said lands, and to their assigns, conveying in fee simple, all the right, title, interest and claim of said county, of, in and to the lands sold by virtue of said execution, to the parties who purchased the same or to their assigns. And it is further ordered that for the purpose of carrying out this order in good faith towards the purchasers aforesaid, and their assigns, the county court of this county does hereby make, constitute and appoint Alfred Eltzroth a special commissioner for and on behalf of said county of Stoddard, to make, execute and deliver to said purchasers or their assigns, letters patent for the lands aforesaid. Said commissioner to receive the usual fee for such services, to be paid by the parties to whom the patents shall be made, which said patents shall be delivered to the parties aforesaid, upon the execution, acceptance and delivery of the mortgages aforesaid, on the production of the County Treasurer's receipt for the pro rata of the aforesaid thirteen thousand five hundred dollars due upon the amount of lands for which the patents are to be issued.''

In pursuance of the order of compromise and the appointment of Alfred Eltzroth special commissioner

to execute the conveyance, the said commissioner conveyed the land in controversy by an instrument in writing in the following form:

"State of Missouri, County of Stoddard:

"*To all to whom these presents shall come—Greeting*: Whereas, D. Starks Crumb of the county of Stoddard, State of Missouri, made full payment to the said county of Stoddard for the following described lands: [The lands described in plaintiff's petition, containing in the aggregate 4,194.67 acres], according to the official plat of the survey of the said land returned to the general land office by the surveyor general, which said tracts have been purchased by the said D. Starks Crumb. Now know ye that the said county of Stoddard, in consideration of the premises, and in conformity with the laws of said State of Missouri, in such cases made and provided, have given, granted, bargained, sold and conveyed, and by these presents do give, grant, bargain, sell and convey unto the said D. Starks Crumb and to his heirs and assigns forever, the above described lands granted by the Government of the United States to the State of Missouri, and by said State of Missouri to the said county of Stoddard, to have and to hold the above described lands, with all the rights, privileges, immunities and appurtenances thereto belonging to the said D. Starks Crumb and to his heirs and assigns forever. In testimony whereof, I, Alfred Eltzroth, special commissioner, duly appointed by the county court of said Stoddard county to sell and dispose of the above-described lands belonging to the said county of Stoddard for and in behalf of said county, have caused these letters to be made patent. Given under my hand and seal as commissioner aforesaid at Bloomfield in said county this 1st day of May, 1869.

"ALFRED ELTZROTH, Special Commissioner."

Properly acknowledged on May 1, 1869; recorded on May 15, 1869.

There were a number of other conveyances issued by said commissioner, as the record discloses, to other persons; but as they are all in similar form, it is unnecessary to insert them, as the form of the one herein quoted will be a sufficient indication of the character of the instrument. Stoddard county, through its officers, had certain portions of these lands sold for taxes, and there was introduced in the Himmelberger case, a sheriff's tax deed, dated March 7, 1891, purporting to convey certain of these lands to the plaintiffs, I. and J. Himmelberger. It also appears from the record that the county court of Stoddard county, in order to induce Himmelberger to pay the taxes on this land that had been returned delinquent, agreed to and did execute another conveyance, dated as late as November, 1897, which conveyance was executed, acknowledged and delivered by the presiding judge of the court of Stoddard county. While these deeds are not relied upon as passing the title to the lands embraced in them, yet they were admitted, doubtless, for the purpose and, at this late day, of showing a recognition and a ratification of the original conveyance, executed by commissioner Eltzroth. It also appears from the record that the defendant Stoddard county introduced records of the county court, indicating a claim by the defendant county of these lands. These orders purported to give authority to certain persons to institute suit for the recovery of these lands. Subsequently, there are other orders introduced revoking such authority. It, however, appears, so far as the record indicates, that all efforts to recover these lands were abandoned by the county.

The record in this case discloses this admission; it appears in the record, as well as in the brief: "We admit that for more than thirty years, the respondents have been the apparent owners of said land and have been paying the taxes levied and assessed thereon by the agents of the county."

This cause was submitted to the trial court, and its findings were for the plaintiffs, as indicated by the decree, which quiets the title of plaintiffs to the land in suit and enjoins the county from further undertaking to dispose of the same. From this judgment and decree defendant appealed.

The lands, the title to which plaintiffs seek to quiet by this suit in equity, are a portion of the lands originally granted to the State of Missouri by act of Congress of September 28, 1850. That act is entitled "An Act to enable the State of Arkansas and other States to reclaim the 'swamp lands' within their limits." The first section provides that "to enable the State of Arkansas to construct the necessary levees and drains to reclaim the swamp and overflowed lands therein, the whole of those swamp and overflowed lands, made unfit thereby for cultivation, which shall remain unsold at the passage of this act, shall be, and the same are, hereby granted to said State." By the fourth section of said act its provisions are extended to and the benefits thereof are conferred upon each of the other States in which such swamp and overflowed lands were situated, thus granting to Missouri all of the swamp lands within her borders which had not previous to the enactment of that law been sold by the United States Government. The second section, after directing a listing of said lands by the Secretary of the Interior, and the issuing of a patent therefor to the State, further provided that "on that patent, the fee simple to said lands should vest in the State subject to the disposal of its Legislature, provided, however, that the proceeds of said lands, whether from sale or by direct appropriation in kind, shall be applied *exclusively,* as far as necessary, to *the purpose of reclaiming said lands* by means of the levees and drains aforesaid." [U. S. Stats. at Lar. 1851, c. 84, pp. 519, 520.]

This act of Congress was a legislative grant and required no formal conveyance to transfer the title to all

of these swamp lands to the several States. It was, as has been repeatedly ruled, a grant *in praesenti*, the selection ordered to be made by the Secretary of the Interior being merely for the purpose of subsequently identifying the land, and the patent when issued relating back to the passage of the act. [Tubbs v. Wilhoit, 138 U. S. 134; Wright v. Roseberry, 121 U. S. 488; R. R. Co. v. Baldwin, 103 U. S. 426; Railroad v. Railroad, 97 U. S. 491; Wilson v. Beckwith, 140 Mo. 385; Schulenberg v. Harriman, 21 Wall. 44.]

After the title to these lands had thus been vested in the State of Missouri, the State through its General Assembly by an act approved February 23, 1853 (Laws 1852-1853, p. 108), donated its swamp lands to Stoddard county, upon the terms and provisions of an act approved March 3, 1851 (Laws 1850-51, p. 238), which granted all of said lands to the county in which they were situated, except such as were situated in the counties of Scott, New Madrid, Pemiscot, Mississippi, Cape Girardeau, Stoddard, Dunklin, Ripley, Butler and Wayne. The State by previous act having appropriated fifty thousand dollars to reclaim said lands in the counties excepted, it was provided in the Act of 1853, that said counties should refund to the State said sum as the price of being placed on an equal footing with all other counties in the State as to their swamp lands.

By an act approved January 28, 1855, so much of the Act of February 23, 1853, as required "that the amount appropriated for the reclamation of said lands, etc., be refunded to the State," was repealed. [Laws 1854-1855, p. 160.] By an act of the Legislature approved February 28, 1855, the several county courts of this State were "authorized to sell and dispose of the swamp and overflowed lands within their respective counties, either with or without draining and reclaiming the same as in their discretion they might think conducive to the interest of said counties." [Laws 1854-1855, p. 160.]

Subsequently, by an act of the Legislature approved November 4, 1857 (Laws 1857, adj., p. 32), all the lands in this State selected under and by virtue of the act of Congress approved September 28, 1850, entitled "an Act to enable the State of Arkansas, and other States, to reclaim the swamp lands within their limits, and which have been or may hereafter be patented to the State," "be, and they are hereby declared to vest *in full title, and belonging to the counties in which* they may lie," this act including by its general terms, Stoddard county. This was the statutory law in regard to these swamp lands, when the revision of the laws took place in 1865. [G. S. 1865, p. 278, et seq.] And such was the law when Ringer obtained his judgment against Stoddard county, which may be accepted as the initiatory step out of which this litigation has grown.

Subsequently, by an act approved March 27, 1868 (Laws 1868, p. 68) the Legislature revised the swamp land laws of the State. The first section of that act is in the identical language of section 1 of chapter 48, General Statutes 1865, p. 278.

By its terms "all of said lands in this State are hereby donated to the counties in which they may be respectively situated, *and shall be the absolute property of such counties,* for the purpose hereinafter designated." This act simply confirmed to the counties the title which had been already granted to them by the Acts of 1851, 1853, 1855 and 1857, above noted. The designated purposes were "drainage and reclamation," the primary and exclusive purpose for which they had originally been granted by Congress to the State, and after that was accomplished and all costs of reclaiming, drainage and selling had been first paid, then the balance should go to the school fund. As already said, in the view we take of this case it is not necessary, in order to sustain the judgment of the circuit court, to hold that these lands could be sold under execution on a general

judgment against the county for a debt entirely disconnected with its administration of its swamp lands.

The important question to determine on this appeal is the power of the county court of Stoddard county to sell and convey these lands, and what limitations have been imposed upon them by our several statutes. In Linville v. Bohanan, 60 Mo. 554, the Act of February 28, 1855, came before this court for construction as to the rights of the counties thereunder, and Judge WAGNER, speaking for the whole court, said:

"By the legislative enactments above referred to the absolute title to the lands was vested in the counties to be disposed of in the discretion of the county courts. The counties were then the proprietors with the right of discretionary disposal, but by a law of the State they were required to apply the proceeds to a particular purpose," to-wit (2 R. S. 1855, p. 1006, sec. 6), "the net proceeds of the sales of all such lands, after defraying the expenses of draining, reclaiming, surveying and selling the same, shall be paid into the county treasury, and become a part of the public school fund of the county."

In that case this court drew a clear distinction between the powers of a county court over the sixteenth section school lands, the title to which had never been in the counties, and these swamp lands, which had been donated to the counties by such plain and unequivocal language as was found in the Act of 1855. Said this court: "The absolute title to the lands was vested in the counties, to be disposed of in the discretion of the county courts. . . . In selling the land they possessed the same powers that owners generally possess under like circumstances, one of the most important of which is the right to buy in the premises to secure the debt," a right which the court had already shown was not in the county as to the school or sixteenth section lands.

When that decision was rendered there was imposed upon the county courts the same duty to cover

the net proceeds, after the costs of reclamation and sale had been deducted, into the school fund that was subquently imposed by the Act of 1868.

The county of Stoddard, as held by this court in State ex rel. v. New Madrid County, 51 Mo. 85, did not acquire its title to the lands in suit by the Act of March 10, 1869 (Laws 1869, p. 66), but by the previous acts already cited, which were continued in the act of March 27, 1868. Prior to the Act of 1868 there was no restriction of the sale of these lands to public sales by the sheriff. By section 3 of that act it may be fairly inferred that the Legislature intended to require them to sell them only at public vendue by the sheriff and for not less than $1.25 an acre. But by the Act of March 10, 1869, there was an unmistakable purpose on the part of the General Assembly to restore to the county courts the power of private sale which they had prior to the Act of March, 1868. The Act of 1869 recites that, "in order to convey to the different counties in the State of Missouri a complete title to all the swamp lands which were granted and have been patented to the State of Missouri by an act of Congress of September 28, 1850, the register of lands is directed to prepare a patent or patents, embracing all the swamp lands lying within the limits of the several counties, conveying thereby all the title and interest of the State in and to such lands," and makes it the duty of the Governor to sign such patents and have them attested by the Secretary of State.

The sixth section of that act provides: "The several county courts shall have full power and control over all such overflowed and swamp lands patented to their respective counties under the provisions of this act, and to *sell* and dispose of the same in like manner and with like effect as now provided by the general statutes in relation to the conveyance of other real estate belonging to their respective counties."

This act came before this court in Pool v. Brown, 98 Mo. 675, and speaking for the court, Judge BRACE said:

"By the Act of March 10, 1869, supra, the whole previous system of the State in regard to these lands was changed, by general law applicable to every county in the State by which a complete title was to be vested in each county by a patent to be issued for the swamp land therein situate, and thenceforth the State delegated to each county the execution of its trust as to the land situate in each county under the general law as expressed in this act and the Act of 1868, supra, which in the main has since remained the general law of the land governing the sale and transfer of title to the purchaser of swamp lands. . . . and thereafter the swamp lands in said county were subject to sale and conveyance by the county under the provisions of the general law expressed in those acts. . . . *The county court had power to sell the land therein described at private sale to such purchaser as it might deem advisable at a price less than* $1.25 per acre upon the terms upon which sale was made." And as confirmatory of his construction of the Act of 1869, the learned judge cites Linville v. Bohanan, 60 Mo. 554, and says further, "*The limitation* of section 3 of the Act of 1868 *as to price applies to public sales of swamp lands,* and this limitation had expired by lapse of time before this sale was made."

Obviously the remark as to the five-year limitation had no reference to the power and right of the court to sell at *private* sale, but merely to give an additional reason why in that case the limitation as to $1.25 would not have been applicable even if it had been a *public* sale.

In Pool v. Brown, the court was called upon to construe the Act of March 10, 1869, as to the powers of county courts in dealing with their swamp lands, and the point in judgment was, what was the scope of that

power? That proposition was met and discussed in the light of all the previous general and special acts of our General Assembly from the time the State had received the donation of these lands from the General Government. The subject-matter was of immense practical interest not only to every county in this State, but to thousands of purchasers throughout the State.

Prior to that act the county court was a mere intermediary trustee for the State. It bargained the lands and received the purchase money, but the title was required to be made by a patent from the Governor. As said by Judge BRACE, the last act requiring a patent by the State to the purchaser was the Act of March 27, 1868, and by the Act of March 10, 1869, the whole previous system both general and local was changed and thenceforth the counties were vested with the title and were authorized to convey such lands just as they could any other lands owned by them.

In that case the lands were sold at private sale for seventy-five cents and the court was requested to declare the law that the county court was not authorized to sell swamp lands for less than $1.25 per acre, and this court responding to this contention unanimously ruled that the limitation as to the price of $1.25 only applied to *public sales* of such lands by the sheriff, and that the county courts were authorized to sell such lands at private sale for less than $1.25 per acre, and fortified its judgment by reference to the decisions in Linville v. Bohanan, 60 Mo. 554. Placing section 6 of the Act of March 10, 1869, in juxtaposition with the Act of 1855, we find that the former confers upon the county courts full power and control over the swamp lands in their respective counties and the right and power to sell and dispose of the same as they had to dispose of other real estate belonging to their respective counties, and in the Act of 1855, they were authorized to sell and dispose of the swamp lands in their respective counties either

with or without draining and reclaiming the same as in their discretion they might think most conducive to the interest of their counties.

In a word, the two acts confer the same power upon the county courts, and this court having construed that an absolute title was vested in the counties by the Act of 1855, and that as to them they possessed the same powers that owners generally possessed, and where a county had sold to a purchaser of such lands on a credit it could buy it in without any further enabling act authorizing it so to do, the only consistent construction of the Act of 1869 was that which the same court had given the Act of 1855. Indeed, when we consider the emphatic, unambiguous language of both of said acts, we are at a loss to see how the court could have reached a contrary conclusion without rejecting the positive command of our statutes, as the construction of laws which requires all courts in this State to give to words their ordinary and usual sense, and conceding as it has everywhere been recognized that the State had the power to grant these lands to the counties divested of all trusts, we can conceive of no words or language which could have better effectuated that purpose than was employed in both the Act of 1855 and that of 1869.

So that while we entirely agree that the county courts are statutory bodies, and we must look to the laws of the State for their powers, we have no hesitancy in putting our fingers upon section 6 of the Act of 1869 as the authority for the county courts to sell and convey the swamp lands in their respective counties at private sale, and for less than $1.25, as was unanimously ruled by this court in Pool v. Brown, 98 Mo. 675. That case was decided nearly fourteen years ago, and until the decision in the case of State ex rel. Public Schools v. Crumb, 157 Mo. 545, was never questioned. In that case without adverting to the unanimous decision of this court in Pool v. Brown, supra, it was ruled that these lands could only be sold at that time by the sheriff

at public vendue on sixty days notice for not less than $1.25 an acre by order of the county court. No reference was made to the decision in Pool v. Brown which had necessarily become a rule of property. We are constrained to think the conclusion in the Crumb case on this point was an inadvertence, but in any event in view of the plain language of the Act of 1869, which was in force when that case originated and in view of the decisions in Linville v. Bohanan, 60 Mo. 554, and Pool v. Brown, 98 Mo. 675, and of the serious consequences which are almost certain to follow to purchasers who have dealt in these lands on the faith of said decisions, the Crumb case on this point at least ought no longer to be regarded as controlling. In Reed v. Ownby, 44 Mo. 206, it was said by Judge WAGNER, speaking for the court: "The question is firmly settled in this State by two direct adjudications, holding that an unrecorded deed is good against a judgment if recorded before an execution sale under the judgment. [Davis v. Owenby, 14 Mo. 170; Valentine v. Havener, 20 Mo. 133.] The counsel for plaintiffs admits these authorities are directly against him, but asks this court to review the question and determine the law otherwise. This we are not at liberty to do. The law has been settled for many years; it has become a rule of property, and titles have been vested on the strength of it. The stability of judicial decisions is of the utmost consequence, as on them reposes the security of property; and they are not to be tampered with to suit the views of different persons." [Dunklin County v. Chouteau, 120 Mo. 577.]

But it may be asserted that in Railroad v. Hatton, 102 Mo. loc. cit. 55, 56, it was said: "The county courts may cause the swamp lands to be sold with or without drainage at public or private sale; but they must be sold for not less than $1.25 per acre."

The same able and learned judge who wrote that opinion made no reference to Pool v. Brown, 98 Mo. 675, in which he had fully concurred, when the question be-

fore the court was whether swamp lands could be sold under the Act of March 10, 1869, at *private sale* for *less* than $1.25 an acre, and it was decided they could be.

But there is nothing to show that the learned judge who wrote that opinion had changed his views as to the proper construction of the Act of 1869, nor that the learned judge who wrote the opinion in Pool v. Brown regarded that case as in anywise affecting his decision in the Pool case. Judge BLACK was construing a contract made in 1882, long after the Act of 1868 had been amended by the Act of 1874 (Laws 1874, p. 101) which expressly provided that the county court could sell swamp lands at private sale without advertisement, but "at a price not less than $1.25 per acre." It was not necessary to decide even in that case at what price the lands could be sold for at private sale, as the court held in the construction of the contract it was neither for drainage nor sale, but a pure gift of the lands to the railroad company if it would run its road on a designated route, and as the law did not authorize the county court under any circumstances to give away these lands, its contract to do so could not be enforced in equity.

As the Acts of 1868 and 1869 were *in pari materia* and entirely consistent the one with the other, neither had been repealed, and the Act of 1874 amending the Act of 1868 doubtless was properly construed as limiting the power of the county courts after its enactment to sell swamp lands at private sale for not less than $1.25, but that case in no manner impinges upon the controlling weight and authority of Pool v. Brown, 98 Mo. 675, as to the proper construction of the Act of March 10, 1869, under which the transactions in suit were had.

That the conveyance by Eltzroth as special commissioner was sufficient to carry the legal title, there can be no doubt. [Hall v. Gregg, 138 Mo. 286; Elliott v. Buffington, 149 Mo. 676; Prior v. Scott, 87 Mo. 303; Wilcoxson v. Osborn, 77 Mo. 621.]

But notwithstanding the Act of 1869 provided in the most emphatic and unambiguous terms that "the several county courts shall have full power and control over all such overflowed and swamp lands, and to sell and dispose of them in like manner and with like effect· as now provided by the general statutes in relation to the conveyance of other real estate belonging to their respective counties," and notwithstanding the Act of 1868, by the eighth section thereof, expressly provided that "the net proceeds of the sales of all such lands, after defraying the expenses of draining, reclaiming, surveying, and selling the same, as herein provided, shall be paid into the county treasury, and become a part of the public school fund of the county," it is insisted the county held the land under a trust which it is said "ran with the lands."

This contention is not a new one, either in this court or in the Supreme Court of the United States. In Dunklin County v. Dunklin County Court, 23 Mo. 456, it was insisted that an order of the district county court, directing the alternate sections of the swamp lands owned by Dunklin county to be sold and conveyed to the Cairo & Fulton railroad in payment of a subscription to the capital stock of said company, was a breach of the trust which Congress confided in the State of Missouri when it granted it these lands in 1850, for the exclusive purpose of reclaiming said lands by means of levees and drains, but Judge LEONARD speaking for this court in answer to such contention, said: "The original grant, made by the State to the counties, was in order to execute this trust, and it is supposed that the trust *is fastened upon the lands,* so that they can not be disposed of by the State for any other purpose. This, however, is not correct; the trust reposed by the United States is in the State of Missouri; it is a personal trust in the public faith of the State, and not a property trust, fastened by the terms of the grant upon the land itself, and following it into whose hands soever it may· pass.

It is proper, however, to remark in vindication of the State, that the original grant by the United States contemplates, of course, a sale of the land, in order to render it available for the purposes of the trust,'' and he cites Cooper v. Roberts, 18 How. 181; Long v. Brown, 4 Ala. 622.

Afterwards the case of the Emigrant Co. v. Adams County, Iowa, 100 U. S. 61, came before the Supreme Court of the United States.  That county had conveyed its swamp lands to the Emigrant Company, and subsequently brought suit to avoid its contract on the grounds, *first,* that the sale of the county's swamp lands was made at a much less price than the law allowed them to be sold for; that by the laws of Iowa it was unlawful to sell them for less than $1.25 per acre, whereas by the said contract nearly 8,000 acres were sold for $2,000; and for fraudulent representations.  Mr. Justice BRADLEY, speaking for the court, among other things said, ''But there was one aspect of it which, at the conclusion of the first hearing, we thought deserving of consideration, and that was the general character of the transaction, viewed in connection with the act of Congress by which these lands were granted to the State.''  He then repeats the provisions of the Act of September 28, 1850, the same under which the State of Missouri obtained the lands in suit, especially the proviso which required the proceeds of said lands, whether from sale or direct appropriation, to be applied exclusively, as far as necessary, to the purpose of reclaiming said lands by means of drains and levees, and said, ''Our first view was, that this trust was so explicit and controlling as to invalidate the scheme finally devised by the Legislature of Iowa for the disposal of the land, under which the contract in question was made.  But on more mature reflection, we are satisfied that such a result did not necessarily follow.''  He then points out that the Legislature of Iowa by Act of February 2, 1853, granted the lands to her several counties, subject

to the conditions of the act of Congress and such laws as the Legislature might thereafter pass. The argument was that it was a scheme to divert the proceeds of the lands from the purposes of the grant, and to that the learned justice answered: "The proviso of the second section of the act of Congress declared that the proceeds of the lands, whether from sale or direct appropriation in kind, should be applied exclusively, as far as necessary, to these purposes. This language implies that the State was to have the full power of disposition of the lands; and only gives direction as to the application of the proceeds, and of this application only 'as far as necessary' to secure the object specified."

It was accordingly held, just as Justice LEONARD had held nearly twenty-three years before, that the county which had thus disposed of its swamp lands could not rescind its contract on the ground that it was a violation of the trust imposed by the act of Congress.

The same doctrine was announced in the subsequent case of Mills County v. Railroad Companies, 107 U. S. 557, in which the Supreme Court of the United States, referring to the duty of the State to apply the proceeds of such lands to reclaiming them, remarked that, "whether faithfully performed or not, was a question between the United States and the States, and it is neither a trust following the lands, nor a duty which private parties can enforce as against the State." And such has been the unbroken line of adjudication in this State. [Sturgeon v. Hampton, 88 Mo. 210; Pool v. Brown, 98 Mo. 681.]

Conceding, as we do, that it was entirely competent for the State to grant these lands to the several counties, either with or discharged of a trust, and that the Legislature could designate, as it did, the purposes to which the counties should devote these lands, we think it is clear that the only use or trust which the State declared, so far as the schools were concerned, was upon "*the net proceeds*" of such lands after deducting all

the expenses and costs of draining, reclaiming, survey-
ing and selling the same. As said by the Supreme Court
of the United States in Emigrant Co.v.Adams County,
100 U. S. loc. cit. 69, the language of the Act of 1868 and
the previous Act of 1851, gave "*the full power of dis-
position of the lands, and only gives direction as to the
application of the proceeds.*" The trust was declared
as to "*the net proceeds*" and not on the land so as to
fasten it on the lands in the hands of the purchasers
from the trustees to whom the county had granted the
absolute power of disposal.

We concede that the State has full power to com-
pel the county of Stoddard to account for "the net pro-
ceeds" of the sales received by the county court from
Ringer, but that is a very different proposition from
that advanced that the county can, after thirty years,
repudiate the sale it made to Ringer, and the patent
which its commissioner Eltzroth made by the direction
of the county court. We are dealing not with a case in
which the county court had no authority to sell and con-
vey the lands in which the acts of the court and its com-
missioner would be void, but at most an irregular or de-
fective execution of an indisputable power, and in a
case in which no fraud is charged or proven. To hold
that this trust is fastened upon these lands in the hands
of these remote purchasers from Ringer, when the sub-
stituted trustees had a plain statutory power to sell and
convey and they had executed that power and their com-
missioner had conveyed the lands by an instrument
which gave no notice of any breach of the trust, would
in our opinion be subversive of all the principles of
equity and justice, especially after the lapse of thirty
years. That the county of Stoddard may be required
to make good to its public school funds the amount it re-
ceived from Ringer and others who purchased these
lands from the county court, is equitable, but it has no
right to repudiate a contract which is not tainted with
fraud because at this late day it is assumed or appears

that the court did not obtain the full value of the lands, although the purchasers were bound to know the power of the county court. We find the court had the undeniable right to sell these lands at private sale for less than $1.25, and this being so, when they made their purchases and paid over to the county the price agreed upon, they are not to lose their title because the authorities of that county now deem the price then received was inadequate. The State selected its agents to sell and convey and did not limit them as to the price they were to obtain, and the inequity is the more glaring because there is no offer made to restore the purchase money which the county has kept for thirty years.

It was not incumbent on the purchasers to see that the county court properly covered the purchase money into the school fund.

Upon the contention that the acts of the county court, in respect to the disposition of the land in controversy, were absolutely void, and that the powers of the county court are limited and defined by law, our attention is earnestly invited to numerous cases decided by this court. Before proceeding to an investigation of these cases, it must be observed that the record discloses, in respect to the sale of this land, that the acts of the county court are divisible. If the county courts were authorized to sell this land, in pursuance of the Act of 1869, then we look to the act of the court that consummated that sale; that is, the Eltzroth patent. That act is regular upon its face—does not purport to be based upon the Ringer judgment, or upon the order of compromise, but specially recites that it is done, in "pursuance of the provisions of the law of this State." That act in itself, if the power to perform it existed, is not void, but in order to have its force and power rendered inoperative, it is necessary, if even appellant's contention is to be upheld, to show by evidence *aliunde,* that such patent emanated from the order of compromise, which appellant insists was without authority of

law. We fully concur in the principles announced in the cases cited, that the powers of the county courts are limited and well defined by the law, and that parties dealing with them must take notice of their limited powers. In the leading case in this State, and the one upon which appellant firmly relies for support of this contention, Sturgeon v. Hampton, 88 Mo. 203, it will be noted that this case was decided by BLACK, J., the same able and learned judge that decided the case of Dunklin County v. Chouteau, 120 Mo. 577, and who was a member of the court when the opinion of Pool v. Brown, 98 Mo. 675, was announced, and concurred therein. An examination of the Sturgeon case will demonstrate that it has no application to the facts in this case. The learned judge announced the principle as applicable to the facts before him. In that case, the powers sought to be exercised were, beyond dispute, unauthorized. In referring to the attempted execution of the two deeds involved in that dispute, the court, through BLACK, J., says: "Both these acts were not simply irregularities, but they were without any warrant or authority in law and are void. *These infirmities appear upon the face* of the deeds and orders to which they make reference, and the purchaser from the company took with full notice." It will be observed, in this case, that the want of authority appeared upon the face of the instrument. It was from this state of facts that the principle was announced that "persons dealing with such agents are bound to take notice of their powers and authority." Conceding for the purposes of this case, that the order of compromise was without authority, such order is totally disconnected with the instrument that undertook to convey the title. There was no reference made to that order. The order of compromise was not such an instrument affecting real estate as was required to be recorded in the land records of the county. We do not, by the views expressed upon this particular branch of the case, pretend that a sale of swamp lands, by a con-

veyance regular upon its face, based upon orders of the county court that were unauthorized, would pass the title to such lands, but simply maintain that the instrument is valid until set aside by appropriate proceedings. It is not absolutely void, but may be avoided in an action for that purpose, upon a showing of independent, unauthorized acts upon which the instrument is based. Persons buying real estate look to the land records—the recorder's office—for the instruments upon which title is based, and the respondents in this case had the right to regard the Eltzroth patent as valid, if, upon its face, it was regular and the county court had the power to have a commissioner duly appointed to make such conveyance. They were not required to examine every detail leading up to the execution of the instrument. While such instrument may have been based upon such irregularities, so that, in an appropriate proceeding, it would be declared invalid, yet notice of such irregularities is not to be imputed to the respondents in this case.

In the case of Butler v. Sullivan Co., 108 Mo. 630, cited by appellants, is simply a reiteration of the principle announced in the case of Sturgeon v. Hampton, supra; hence, what is said as to the application of that case to the case at bar is for the same reason applicable to the Sullivan county case.

The case of Railroad v. Wayne County, 125 Mo. 351, was a suit upon a contract entered into by the county with the railroad company, relative to certain work in respect to draining certain swamp lands belonging to Wayne county. All the defects and infirmities appeared upon the face of the contract, and that suit was on the contract, and the court announced the principle discussed under this contention. We readily assent to the doctrine as announced upon the facts in that case, but a casual examination of it will demonstrate beyond dispute that it is not applicable to the case before us.

In the case of Moss v. Kauffmann, 131 Mo. 424, the county of Bollinger sold swamp land to Thomas Allen and accepted stock in the St. Louis, Iron Mountain and Southern Railway Company in payment. This appeared upon the face of the deed. The court said, through BURGESS, J., that this deed "was void and of no effect, and all persons purchasing under it were bound to take notice of its infirmities. No extrinsic evidence was necessary to show its invalidity, which appeared from its recitals." It will be observed that the notice imputed to the purchasers of that title, was of defects and infirmities that were stamped upon the instrument itself.

In the case of Hooke v. Chitwood, 127 Mo. 372, there was no evidence upon the face of the instrument that the county ever sold the land; hence, the court very appropriately quoted the principle that "the statutes constituted the warrant of authority" in the county courts to sell or dispose of swamp lands.

As to instruments where the defects appear on the face of the instrument, the rule announced in the case of Tydings v. Pitcher, 82 Mo. 379, and other cases on effect of notice cited by appellant, will apply; but they do not apply where the instrument is regular on its face and is issued by proper authority. In the patent executed by commissioner Eltzroth, no reference is made to the order empowering him to act as such commissioner, nor does it make any reference to the order of compromise. Nor was it necessary for him to recite the power under which he acted. [Henry v. Atkison, 50 Mo. 266; Swartz v. Page, 13 Mo. 603; Jamison v. Fopiana, 43 Mo. 565.]

In the case of Tydings v. Pitcher, supra, the true test as to the character of notice that is to be imputed to a purchaser, is very tersely stated, in the language of Commissioner LEONARD of New York: "The principle of equity is well established that a purchaser of land is chargeable with notice, by implication, of every

fact affecting the title, which would be discovered by an examination of the deeds or other muniments of title of his vendor. If there is sufficient contained in any deed or record which a prudent purchaser ought to examine, to induce an inquiry in the mind of an intelligent person, he is chargeable with knowledge or notice of the facts so contained." [Cambridge Valley Bank v. Delano, 48 N. Y. 366.] Apply this test and we find that the notice imputed to a purchaser is of the recitals in the muniments of title.

We repeat that the only instrument in respect to the sale of the swamp land by Stoddard county involved in this case that was entitled to a place upon the land records of Stoddard county, was the one that evidenced the sale of the land, that is to say, the Eltzroth patent. Of this instrument and its entire contents, the respondents were charged with notice. Again we say, they were not required to investigate and examine the various orders of the county court authorizing such conveyance. They had the right, as was announced in the case of State ex rel. Board of Education v. Wayne County Court, 98 Mo. 362, to assume that "public officers have proceeded in obedience to, not in disregard of, their duties and obligations as such."

It is insisted by appellant that the acts of the county court of Stoddard county were void and that respondents are charged with notice of all the orders of the county court, and its acts being void, can not be ratified, and that the county can not be estopped by reason of such void acts.

If such contention is maintained, we are unable to discover upon what theory the learned judge, in the case of Dunklin Co. v. Chouteau, supra, reached the conclusion he did, in respect to the contention in that case, which is identical in principle with the one involved in the case before us. In the Dunklin county case, there was involved a hundred thousand acres of the most valuable swamp land in that section of the State. The district county court of Dunklin county subscribed for

stock in the Cairo & Fulton Railroad which was to be built through the county. A patent was issued by the Governor of the State, referring to the orders of the district court, conveying the lands to the railroad company. This suit was instituted thirty-three years after the district court had made the orders and the patent issued in pursuance thereof, to set aside the patent and orders of the district court. It was insisted by the county in that case, just as it is being insisted in this case, that the orders of the county court were void and without any warrant of law, and that the purchasers were imputed with notice of such void orders. It was insisted that under the statute in force, providing for subscription to the stock of railroad companies, to be paid for by a conveyance of swamp lands to be selected by said railroad company, it was essential to the validity of such conveyance that a petition signed by a majority of the voters of the county must be presented to the district county court, requesting the court to subscribe for stock in the Cairo & Fulton Railroad Company. It was also contended that in order to support the validity of such subscription it was necessary to have a vote of the taxpayers on such proposition. The record of the district county court of Dunklin county disclosed that the petition was not signed by the proper number of voters, and that there was no vote taken by the taxpayers of the county, yet, in that case, the court says: "But let it be conceded that a vote of the taxpayers was essential to a valid subscription and that such a vote was essential to a valid transfer of the lands to the company in payment of the subscription; still it does not follow that the county should have the decree prayed for in this case. We think the county has no standing in a court of equity to question the validity of the sale at this late day." And the court held, in that case, that the conduct and action of the agents and officers of Dunklin county was a ratification of the transfer of the lands in suit. If the court in that case had maintained the position urged in

the case at bar, then no such conclusion could have been reached, for the subsequent purchasers in that instance were in no better attitude than the purchasers in this case. An examination of the record would have disclosed the irregular and void orders of the district county court and notice of it would be imputed to them. But the court, as it doubtless did, from the discussion in the case, reached the conclusion that as the patent was regular upon its face, at least that was not a void act, and that the subsequent purchasers were not charged with notice of the void orders. That case was ably presented by counsel, and is regarded by the bench and bar as being most carefully considered, upon the questions involved. We regard the reason of the learned judge as sound and well supported by the adjudications and see no reason why that case should be overruled.

It is next insisted by appellant that "this case in its very nature, is not susceptible of being controlled by the doctrine of laches." In respect to that contention, we will say that, having reached the conclusion that the county court of Stoddard county had the power to sell the lands under the Act of 1869, at private sale, through its appointed commissioner, at less than $1.25 per acre, we are of the opinion that the patent executed by commissioner Eltzroth was not absolutely void. And this leads us to the discussion of the only unsettled question, in that contention, and that is as to the application of the doctrine of *laches* to counties.

The administration of equitable principles is not dormant, but as the development of the county and business interests advance, new subjects are created to which these principles are to be applied, and it has very appropriately been elsewhere said:

"It is a mistake to assume that the doctrine of laches or delay, or the doctrine of estoppel, does not apply to a county or other municipal corporation. Indeed, it may be said that there is no State, or any of the political subdivisions of a State, against which the doc-

trine of estoppel or laches may not in certain instances
be urged.   If a transaction shows all the observances of
the law, then the law itself will afford all the relief nec-
essary, and estoppel or laches need not be urged.   It
is only where there are irregularities by the officers and
agents of States or municipalities in the performance of
certain duties imposed upon them by the Constitution or
laws, that there is reason that they should not be allowed
to insist that the act was improperly or irregularly
done to the prejudice of those who, in good faith, have
assumed, and acted upon the assumption, that the acts
of such officers and agents were within their power to
perform.   The doctrine of estoppel is not only a very
old doctrine, but, it may be said, is one that 'has grown
with the growth' of human affairs.   It is a principle
whose existence is not to be deprecated, for its enforce-
ment not only prevents the commission of a wrong upon
those who are innocent, but it teaches the moral lesson
to all persons that they shall not to-day dispute the truth
of what they said yesterday, to the financial injury of
others.   'Its foundation is laid in the obligation which
every man is under to speak and act according to the
truth of the case.'   [Hermann on Estoppel and Res
Adjudicata, sec. 14.]''

In the case of People v. Maynard, 15 Mich. 463,
where the invalidity of an act organizing a county was
suggested on constitutional grounds, CAMPBELL, J.,
says:

"If this question had been raised immediately, we
are not prepared to say that it would have been alto-
gether free from difficulty.   But, inasmuch as the ar-
rangement there indicated had been acted upon for ten
years before the recent legislation, and had been recog-
nized as valid by all parties interested, it can not now be
disputed.   Even in private associations, the acts of par-
ties interested may often estop them from relying on
legal objections, which might have availed them if not
waived.   But in public affairs, where the people have

organized themselves under color of law into the ordinary municipal bodies, and have gone on year after year raising taxes, making improvements, and exercising their usual franchises, their rights are properly regarded as depending quite as much on the acquiescence as on the regularity of their origin. . . . Whatever may be the rights of individuals before such general acquiescence, the corporate standing of the community can no longer be open to question. . . . The exercise of jurisdiction being notorious and open in all such cases. . . . there is no principle which could justify any court in going back to inquire into the regularity of the law of 1857.''

To the same effect is the case of People ex rel. v. Alturas County (Idaho), 55 Pac. 1067, where the court says that ''public policy and sound principles of law require that the State now be held estopped from questioning the manner of the passage of the act in question.''

In the case of Adams County v. Railroad, 39 Iowa 507, where the county set up the title to swamp land claimed by defendant, the court held that the plaintiff, by assessing the lands to the railroad company and collecting taxes from the company thereon, had estopped itself from claiming title to the land as against the company.

The cases are very numerous in which it is held that a county may be estopped by the acts of its agents.

In the case of Railroad v. Marion Co., 36 Mo. 294. it is said: ''Where a county, acting under authority it supposed to be valid, subscribed to the stock of a railroad company in good faith, issued its coupon notes in payment of such subscription, for a series of years, voted such stock and paid its coupons, and such notes passed into the hands of innocent and bona fide purchasers, it is estopped from asserting that such notes were illegally issued.''

Vol 173 mo—30

The case of Dunklin County v. Chouteau, 120 Mo. l. c. 594; Boone County v. Railroad, 139 U. S. 684; Colonial & U. S. Mortgage Co. v. Tubbs (Tex.), 45 S. W. 623; State ex rel. v. West, 68 Mo. 229, announced the same principles in respect to this subject.

If the Legislature had never conferred upon the counties the power, through their county court, to sell and dispose of swamp lands, and the court had undertaken to do so, it is very clear that no subsequent action of the counties could have ratified the unauthorized act of the county court.

The principle is that, where a county court is charged by law with the performance of certain duties in reference to a particular subject-matter, and that court undertakes, in good faith, to execute its powers, but fails to observe certain requirements of the law, so that its acts in that regard are irregular, such acts, if acquiesced in, will become binding upon the counties as completely as if they had been regular in the first instance.

Here, the Legislature authorized the counties to sell the swamp lands. When Stoddard county undertook to sell the land, it but exercised the right of disposing of the land conferred upon it by the Legislature. It had the right to sell it, and, as we think, at public or private sale. Anyhow, it had the right to sell it, and it did undertake to sell it more than thirty years ago, and had acquiesced in the sale which it has made ever since.

We take it that it is no longer a disputed question that the doctrine of *laches* applies to a county or other municipal corporation, as well as to individuals.

This brings us to the application of the doctrine of delay or laches, to the facts of this case.

The admission of appellant in respect to the conduct of Stoddard county in reference to these lands for the last thirty years, renders it unnecessary to minutely detail all the testimony submitted in the trial court. The

appellant says: "We admit that for more than thirty years the respondents have been the apparent owners of said land and have been paying the taxes levied and assessed thereon by the agents of the county." It will be noticed that these respondents are, not the original purchasers from Stoddard county; that they purchased these lands upon the faith of the regularity of the conveyance of Eltzroth, the commissioner; that they placed their deeds upon record; that those from whom they purchased and the respondents have been regularly assessed and have paid the taxes on this land for more than thirty years. It will be observed that the county of Stoddard, in consideration of the conveyance, as executed by the commissioner, accepted thirteen thousand and five hundred dollars; that the respondents and their grantors have had such possession of these lands as they were susceptible of, and at all times and under all circumstances have claimed to be the legal owners thereof. Appellant in this case makes no pretense of offering to return the money it received; but simply takes the unenviable position, "We have had your money for thirty years, have made you pay the taxes for all those years; we will now retain all this, and take the land, in addition," and this court is asked to denominate this as the administration of equity to the parties in this suit.

There was some evidence introduced that the $13,-500 in warrants issued by Stoddard county and accepted by it, were only worth thirty or forty cents on the dollar, and it is intimated by counsel for the Board of Education, that this is an important fact in the consideration of this case. It will be observed that the Board of Education is not a party to this suit. The county of Stoddard is the only party defendant, and the only necessary party in this proceeding; and we say now, that, standing as she does in a court of equity, her position is a very unfavorable one, to ask this court to consider the worthlessness of its own obligations, cre-

ated by itself, and for the payment of which her entire
taxable property is subject. These warrants in the
hands of Stoddard county were worth one hundred
cents on the dollar. However this may be, it does not
meet the difficulty presented to the appellant in this
case. As before stated, the patent did not disclose that
the payment for this land was in county warrants, and
if this was a valid ground for avoiding the patent issued
by its commissioner, regular in all respects upon its
face, the courts were open and ready to render such
relief as the county might be entitled to.

The chancellor who tried this case doubtless
reached the conclusion that appellant was a long time
in making known her grievances in this transaction,
which is now so earnestly urged as a base outrage. It
is no answer to the proposition involved in this case
to say that the county courts are the trustees of a
sacred fund. The people are the beneficiaries of this
fund, and the county court represents the people; and
while we fully concur in the doctrine, that the county
courts are creatures of the statutes, with limited and
well-defined powers, it is not contemplated that they
are to be regarded as perfect "dummies," and the
sooner and more firmly it is impressed upon the public
that the acts and conduct of public officials may, under
certain conditions, affect the interests of the public, the
more readily will the conclusion be reached that in the
selection of our official representatives, it is important
that some attention be given, not only to their honesty,
but also to their business discretion and judgment. If
these lands were improperly disposed of by Stoddard
county, her agents and officials knew it as well twenty-
five years ago as they do now, or at least they had the
same opportunity of knowing it, and still these parties
are permitted to remain in possession of these lands,
exercise acts of ownership over them, and at this late
day (1898) after the expiration of thirty years, for the

first time take steps to resell them. This, we do not think, upon any principle of equity, can be done.

The Dunklin county case, supra, is decisive of this. The facts in that case did not appeal as strongly to the conscience of the chancellor as they do in the case at bar. Dunklin county never received a dollar in consideration for the large body of land conveyed in the patent by the Governor. The Cairo & Fulton railroad to which these lands were conveyed, was never built; it was simply a railroad on paper. Still the county remained silent for thirty years, assessed and collected taxes on the land, made compromise deeds, and the learned judge in that case said: "No excuse whatever is offered for the long delay and inaction on the part of the plaintiff. The neglect of the county in asserting its rights in a proper way for so great a length of time, to the continual prejudice of the rights of the defendant, can not be excused. Courts of equity can not and ought not to give relief in such a case. The delay and conduct of the county is a complete bar to the relief which it now asks, and this is true, though the defendant may not have had ten years' adverse possession of the lands."

The same doctrine is clearly announced in the case of Boone County v. Railroad, 139 U. S. 684. The court said in that case: "The principle of ratification by laches or delay is as applicable to such a municipal corporation as it is to a private corporation or to an individual person."

The principle of applying *laches* to counties, finds strong support in the recent case of American Stave & Cooperage Company v. Butler Co., 93 Fed. 301. This was a suit against Butler county to quiet title to certain swamp lands which had previously been conveyed by said county to the Iron Mountain Railway Company, the grantor of plaintiff. Butler county undertook by its answer in that case, as Stoddard county does in this, to avoid the conveyances, for the reason that the county had been defrauded out of its swamp land. ADAMS, J.,

in passing upon the questions involved, said: ''If the county had seasonably instituted some proceedings for rescinding the contracts and conveyances in question, it may be that relief could have been afforded. But a different question is raised at the present time. The railroad company, upon securing title to the lands in question, in 1871 and 1874, proceeded to exercise such acts of ownership and control over them as their locality and condition permitted. It, and its rival claimant to title, Mr. Chouteau, paid the taxes duly assessed by Butler county for a period of twenty years or more. . . . It is altogether too late for the county to take any such position. Its acquiescence for twenty years or more effectually bars it from any attempt at rescission at this late day. Applying the principle announced by the Supreme Court of the United States in the case of Boone Co. v. Railroad, 139 U. S. 684, the county by its delay or laches, has effectually ratified what was, at the worst, but a voidable transaction between it and the railroad company.'' He cites in support of this principle, applied in that case, Dunklin Co. v. Chouteau, 120 Mo. 577.

To the same effect is the case of Rummel v. Butler Co., 93 Fed. 304. In this last case cited, lands were conveyed in payment of subscription of stock to the Cairo & Fulton company. The county asserted that the subscription for stock and the conveyances were invalid. ADAMS, J., said in deciding the case: ''The county must be held to have effectually ratified its subscriptions, . . . by its long delay and laches in asserting any claim to the contrary.''

It must be remembered that the cases cited as applying the doctrine of laches to counties were cases in which the very character of land (that is to say, swamp land) was involved, as is in suit in the case before us, and in these cases it was urged with the same earnestness and ability that this land being held in trust for the school fund, this doctrine did not apply. The courts.

applied it with its full force, and we fully concur in their application of the doctrine.

The facts in this case fully warranted the trial court in the conclusions reached; it was especially appropriate to apply this doctrine upon the facts as disclosed. It must not be forgotten that these respondents are not the original purchasers of this land; but they stand before the chancellor, innocent purchasers for value, in good faith; their position entitles them to every favorable presumption in their behalf. If the county of Stoddard had rights in this land, her long silence, her acceptance and retention of the money paid her, her continuous acceptance of taxes and efforts to enforce the collection of the assessments levied, are a complete ratification of the conveyance made by commissioner Eltzroth to these lands, and the appellant is now estopped by reason of the laches or delay in asserting such rights.

This leads us to the last proposition involved in this case. The General Assembly at its session in 1901, enacted the following provision in respect to swamp lands. Section 8197, Revised Statutes 1899, was amended, and the amended section contained this proviso: ''Provided, further, that in all cases where the county courts of this State have, prior to 1880, sold or disposed of any such swamp lands in their respective counties and issued, or caused to be issued, patents for the same, and the patentees, or those claiming under them, have been claiming such lands and paying county and state taxes thereon for more than twenty years, such grants shall be deemed and held to be good and valid, and no action shall be maintained for the purpose of setting aside or calling in question such patent or patents.'' [Laws 1901, p. 202.]

This amended section presents two questions for our consideration:

First.   What is the force and power of the act?

Second.   The act not being in force at the time of the trial of this cause in the lower court, can this court,

where this cause is now pending on appeal, apply this new statute in the determination of this *case?*

It is unnecessary for us to state that the swamp lands in the respective counties of this State, have been the subject of litigation for years past; for we need only turn to the numerous reports of cases in the appellate courts, or examine the dockets in the circuit courts of State, to have a full and complete verification of this statement. This statute was doubtless intended as a curative act; its purpose was to make valid powers defectively executed, and put an end to litigation on this subject.

As we have heretofore stated in this opinion, the title to these lands were vested in the counties, with power of disposition; the trust reposed in the counties by the State, in donating these lands, was a personal one, applicable alone to the net proceeds of the sale. These lands were held in subordination of the power of the State. A county is simply a part of the State; it is a mere subdivision of it. Although these lands were donated to the counties by the State, it did not divest itself of all control or management over the same. [Barton Co. v. Walser, 47 Mo. 189.]

In fact a reference to the innumerable statutes upon the subject of swamp land, will disclose that the State has ever kept in touch with those lands, and from time to time, as occasion required, has changed the method of disposition by the counties. In fact all the power, capacity and duties of the counties are derived from the Legislature, and they are subordinate to the power of the State, through this legislative body. [Hamilton v. St. Louis Co., 15 Mo. 3; People ex rel. v. Power, 25 Ill. 190; East Hartford v. Hartford Bridge Co., 10 How. 511.]

An act was passed by the Legislature very similar to this one in 1868. It provided: ''Section 1. That all deeds or patents granted or made by the county courts of the State, in which any of the lands known as swamp

or overflowed lands may lie, shall be deemed and held to be valid and legal, whether issued by the county court or a commissioner appointed by the said court for that purpose; and such deed or patent shall vest in the purchaser of any such lands all right, title or interest of said counties in said lands, as fully as if said patents or deeds had been granted by the Governor of the State and countersigned by the Secretary of State, as is now provided by general statutes; and the funds arising from such sale shall constitute a part of the school fund of the respective counties, as is now provided by law." [Laws 1868, p. 67.]

This act was in judgment before this court in the case of Barton County v. Walser, supra. The act was held valid. The court announced in that case that as between individuals, "the Legislature can not validate void deeds; but counties are not individuals; they are political divisions of the State; their functions are of a public nature; they hold their property in subordination and under the control of the Legislature." In that case the deeds validated were void; they were executed by a person without authority.

The conclusion reached in the Barton county case was bottomed upon the ground that the Legislature had given the power to the counties to dispose of the land; that the counties had exercised the power, but not in the method designated by statute. The court further said in that case that "no vested right of the citizen is interfered with. The State is only rendering valid the acts of one of her political divisions, which was done under and by virtue of the authority of the Legislature, but was carried out and executed in an informal manner. The Act of 1868 is a legislative confirmation, and simply makes good the acts of the officers in the same manner as if they had proceeded in a formal, regular way in the execution of their authority." The case of Barton Co. v. Walser, supra, was approved in the case of Sturgeon v. Hampton, 88 Mo. 203.

The act before us for interpretation does not impair any vested rights of individuals, nor does it undertake to validate void instruments; but the act itself is based upon equitable grounds. The State in the exercise of its just power, by this act simply said to her people, who had for more than twenty years been responding to its demands for taxes upon lands that they claimed as their own, and who in good faith believed that they had the legal title, "Your claim and right to this land shall be quieted." In this case it is admitted that the patent was issued over thirty years ago; that the taxes have been paid by the parties claiming through the patent.

It is true in the Barton county case, it is said the money was paid and went into the school fund; but that does not prevent the principle from being applicable to the case at bar. In this case it is not pretended that this transaction was based upon fraud; but doubtless the county court proceeded upon the theory that Stoddard county was not only the legal owner of the land, but that there was no trust as to the proceeds of the sale and accepted the $13,500 in warrants issued by Stoddard county, and upon receipt of this, the patent was issued. As to whether the county of Stoddard had ever applied the value of the consideration received, to the school fund, the record does not disclose. We do not think that the respondents or their grantors had to follow the fund.

In the case of Moss v. Kauffmann, supra, the facts in that case were that Thomas Allen purchased from Bollinger county certain swamp lands, and paid for them in railroad stock, which appeared upon the face of the deed. This deed was held void; but the county of Bollinger had converted the railroad stock into money. Houck and Brown succeeded to whatever equities Thomas Allen had in the money realized by the county from the stock; they afterwards purchased the land from Bollinger county, and the value of this railroad stock was considered a part of the purchase money.

BURGESS, J., in that case, as to the title thus obtained by Houck and Brown, said: "We can see no reason why the title thus acquired by them should not be upheld. Certainly this deed is not void."

In the case of Linville v. Bohanan, 60 Mo. 554, the commissioner sold the swamp land on a credit, the purchaser executing a mortgage for the purchase money. The land was sold in pursuance of the provisions of the mortgage and the county became the purchaser. There was no provision of the statute authorizing the county to buy. This transaction was upheld, under the statute then in force, which authorized the county courts to sell and dispose of the swamp lands.

These cases indicate very clearly that the title to these lands being in the county and the trust only being applicable to the proceeds of the sales, the *powers* of the county court, as designated by statute, in respect to the sale and disposition of these lands, are not to be construed as meaningless. But aside from this, the Act of 1901 is not to be construed as making a patent valid that recites a consideration which would make it void; but its application is sought as to patents reciting "that full payment has been made to the county of Stoddard as provided by the laws of this State."

When this act was passed, the State, to whom the counties are subordinated, was presumed to know the conditions and character of title it desired to relieve and quiet, and when it stretched out its strong arm to accomplish this purpose, we are of the opinion that it had full power to do so.

The only remaining question is the power of this court to apply the curative provisions of the Act of 1901 to this case, the act not being in force at the time of the trial in the lower court. This is the first time this question has ever been presented to this court for determination. Upon an examination of this subject, we find that recognized authority fully supports the contention of respondents, and that this court has the

power, and it is appropriate, to apply the provisions of this curative act to the cause before us. Mr. Chief Justice MARSHALL, in the case of United States v. The Schooner Peggy, 1 Cranch 38, announces the doctrine very tersely. He says: "It is in general true, that the province of an appellate court is only to inquire whether a judgment when rendered is erroneous or not. But if subsequent to the judgment, and before the decision of the appellate court, a law intervenes, and positively changes the rule which governs, the law must be obeyed, if it is obligatory." Cooley's Const. Lim. (6 Ed.), p. 469, states the rule in this way: "The bringing of a suit vests in a party no right to a particular decision, and his case must be determined on the law as it stands, not when the suit was brought, but when the judgment is rendered." It may be said that the last citation has reference to judgments in the trial court. This may be true, but we see no valid reason why the court, if it finds a law intervening subsequent to the judgment changing the rule as applicable to that judgment, could not apply it. If this Act of 1901 is the law of the land, then we can apply it in support of the judgment of the lower court. Certainly, it will not be disputed that if this act is obligatory and if this case was reversed, we could require the trial court to enforce it. If we have the power upon reversal to say to the lower court that this statute is in force and entitles the respondents to a judgment, we have the right to do directly what we could do indirectly.

This curative act not only provided that "no action shall be maintained for the purpose of setting aside or calling in question such patent or patents," but it expressly declared that *"such grants shall be deemed and held to be good and valid."*

The patent involved in this case, together with all the acts of the parties claiming through such grant, are brought directly within the character of instruments intended to be cured by the Act of 1901, and if such in-

strument was burdened with any defect or irregularity, that act cured it.

Entertaining the views as herein expressed, we have reached the conclusion that the action of the trial court was not only appropriate and just, but is supported by every principle of equity, and its judgment will be affirmed. *Burgess, Gantt* and *Valliant, JJ.,* concur; *Robinson, C. J.,* and *Brace* and *Marshall, JJ.,* dissent.

### Dissenting Opinion.

BRACE, J.—I do not agree to the foregoing opinion of the majority of the court, but adhere to the views expressed in the original opinion in this case, delivered on March 28, 1902, and in which all the members of the court except Burgess, C. J., then absent, concurred, and which is as follows:

"These two cases were tried together, brought here on a single transcript, and may be treated as one case. The decrees of the circuit court were in favor of the plaintiffs in each case, and the defendant appeals.

"On March 13, 1868, in the Stoddard Circuit Court, a judgment was rendered as follows:

" 'Louis M. Ringer v. Stoddard County—Civil Action: Debt. Now comes the plaintiff by his attorney and it appearing to the satisfaction of the court that the defendant herein has been duly notified of this proceeding by personal service as the law directs, and that said plaintiff did at the last term of this court recover an interlocutory judgment against said defendant and the said defendant being solemnly called comes not but continues to make default, whereupon, upon said motion, said judgment is made final for $1,136.08. It is therefore considered and adjudged by the court that said plaintiff recover of and against said defendant his debt aforesaid in form aforesaid found, in the sum of $1,136.08, together with his costs and charges by him

laid out and his said suit in this behalf expended, which costs amount to $10.65, and that he have execution therefor, and that this judgment draw interest at the rate of six per cent per annum.'

"In pursuance of an execution issued upon said judgment dated August 17, 1868, the sheriff of said county levied upon all the right, title and interest of Stoddard county in and to 80,172.71 acres of land situate in said county, and on September 15, 1868, sold said lands to D. Starks Crumb and Louis M. Ringer for the sum of $663.95, and duly executed and delivered to them a deed therefor dated September 16, 1868. The lands thus sold and conveyed were swamp lands donated to the State of Missouri by act of Congress approved September 28, 1850, and by the State of Missouri donated to Stoddard county by the act of the General Assembly approved March 27, 1868, and previous acts for the purposes in said acts designated (Laws 1868, p. 68; Laws 1857, p. 32; Laws 1854-5, p. 154; Laws 1852-3, p. 108; Laws 1850-1, p. 232).

"Afterwards on April 23, 1869, an order was entered of record by the county court of Stoddard county as follows:

" 'Whereas at the March term, A. D. 1868, of the circuit court of Stoddard county, in the State of Missouri, Louis M. Ringer obtained a judgment against Sotddard county upon warrants on the swamp land fund of said county, upon which said judgment an execution issued according to law, by virtue of which said execution the sheriff of Stoddard county did seize and levy upon all swamp land owned and possessed by said county, of which said lands so levied upon one hundred and seven thousand or near that amount of acres of said lands were sold by said sheriff in due accordance of law at the September term of the circuit court of Stoddard county, A. D. 1868, to Louis M. Ringer and others; and whereas, the county court of Stoddard county, did at its February term, A. D. 1869, by an order of record,

appoint William G. Pelham and David G. Hicks, at-
torneys for and on behalf of said county, to institute
suit for the recovery of the lands sold as aforesaid,
granting to them the interest of the county to fifty thou-
sand acres of lands so sold as their fee: Now, there-
fore, in consideration of the facts that said suit would be
attended with much uncertainty in the recovery of said
lands and require years of litigation to terminate the
same, it is, therefore, considered by the court that a
compromise of the same would be for the benefit of the
said county of Stoddard if made with the parties who
bought said lands at said sale, whose names are as fol-
lows, to-wit: Louis M. Ringer, D. Starks Crumb, Eras-
tus W. Hill, Thomas W. Johnson, Samuel J. Burdett,
L. Frank Starrs, Robert W. Carter, M. E. Leach, Wil-
liam P. Knox, Clarissa M. O'Dell, H. H. Bedford,
James Frazier, William W. Norman, J. More, J. E.
Liles and Jesse B. Legget; and, whereas, said pur-
chasers agree and covenant to pay to the said county the
sum of thirteen thousand five hundred dollars in Stod-
dard county warrants, which sum is to be paid into the
county treasury on the following terms and in the fol-
lowing manner, to-wit: said parties either paying as
aforesaid or executing their promissory notes, bearing
six per cent interest; one-half of said sum shall be paid
as aforesaid on or before the first day of January, A.
D. 1870, and the remaining half on the first day of
January, A. D. 1871, each of said parties giving notes
for their portion of said sum shall secure the same by
mortgage on real estate to the satisfaction of the county
court of the said county. Therefore it is considered,
adjudged, ordered and decreed, that in consideration of
the premises aforesaid, the county court shall and will
cause letters patent to be issued to the purchasers of
said lands, and to their assigns, conveying in fee simple,
all the right, title, interest and claim of said county,
of, in and to the lands sold by virtue of said execution,
to the parties who purchased the same or to their as-

signs.  And it is further ordered that for the purpose of carrying out this order in good faith towards the purchasers aforesaid, and their assigns, the county court of this county does hereby make, constitute and appoint Alfred Eltzroth a special commissioner for and on behalf of said county of Stoddard, to make, execute and deliver to said purchasers or their assigns, letters patent for the lands aforesaid.  Said commissioner to receive usual fee for such services to be paid by the parties to whom the patents shall be made, which said patents shall be delivered to the parties aforesaid, upon the execution, acceptance and delivery of the mortgage aforesaid, on the production of the county treasurer's receipt for the pro rata of the aforesaid thirteen thousand five hundred dollars due upon the amount of lands for which patents are to be issued.  And it is further ordered that on compliance a special provision of this compromise, William G. Phelan and David G. Hicks are to receive out of said lands so sold, ten thousand acres each, in lieu of the fifty thousand acres mentioned heretofore, the same to be selected.  Said selection to be justly proportioned between the parties who are to receive patents for said lands as aforesaid in equal pro rata of said lands so sold, that being seventeen and one-half per cent.  And the commissioner aforesaid is hereby ordered to issue to said Phelan and Hicks patents for the lands so selected, upon their securing or paying to said county fifteen hundred dollars of said thirteen thousand five hundred dollars.  And it is further ordered that upon the issuing of patents to William G. Phelan and David G. Hicks to the amount of lands above mentioned, then the order made at the February term, 1869, granting said Phelan and Hicks as attorneys to protect the interest of said county fifty thousand acres of said land, shall be considered, revoked, held for naught and cease to be of effect.'

"Afterwards on and before May 1, 1869, the said special commissioner in pursuance of said order, upon

Simpson v. Stoddard County.

compliance with the terms thereof, issued patents to the purchasers. By mesne conveyances the plaintiff, Albert P. Simpson, has acquired the title of the said Ringer and Crumb so conveyed by said sheriff's deed and patents, to 9,121.50 acres of said land and the plaintiffs Himmelberger have acquired title to 640 acres thereof.

"Afterwards in an action in ejectment in the United States Circuit Court for the Eastern District of Missouri this title came before that court for adjudication in the case of Stone v. Perkins, 85 Fed. 616, in which it was decided 'that the land in question was held in trust by Stoddard county for the ultimate use and benefit of the public schools of the county, and was not a part of the general assets of the county of Stoddard, or subject to be sold on execution to pay a general judgment against the county.' Hence, 'the plaintiff's remote grantor acquired no title by virtue of the execution sale, and the plaintiff has acquired none by the several mesne conveyances from such grantor to him.' And that, 'The county court exceeded its authority in making the compromise agreement in question, and the deed made by the commissioner, Eltzroth, to plaintiff's grantor, pursuant to such compromise, conveyed no title for the following reasons: (1) Because the compromise was based upon a recognition that Ringer had some right to the land, arising out of the execution sale, and in the settlement with him, and the deed executed pursuant thereto, trust property belonging to the public schools was indirectly appropriated to the payment and satisfaction of a general judgment against Stoddard county. (2) Because the compromise involved a settlement of a large demand, on the part of the attorneys above named, against Stoddard county, arising out of their said contract of employment with the county. (3) Because, by the terms and provisions of the compromise, the land was bartered; that is to say, was not sold for cash, or for work done or to be done in draining other swamp

Vol 173 mo—31

lands. (4) Because, treating the consideration received as the equivalent of cash to the amount of the alleged face value of the securities taken (the same being $13,500, in the aggregate, for 107,000 acres of land sold), it amounts to only about eight cents per acre, instead of $1.25, as required by the Act of March 27, 1868, supra, as construed by the Supreme Court of Missouri, supra. (5) Because the compromise as made, taken as a whole, as above analyzed, can in no proper sense be regarded as a sale and disposition of the swamp lands for the benefit of the schools of the county, under and pursuant to the statutory authority conferred upon the county court.'

"Afterwards on April 16, 1898, the county court of Stoddard county made an order, of record, as follows:

" 'On this day the question of the future action of this court in relation to the swamp lands of Stoddard county known as the "Ringer lands," coming on to be heard, and the court being fully advised in the premises doth consider and adjudge that, in view of the recent decision of Judge Adams of the United States Circuit Court for the Eastern District of Missouri in the case of Stone v. Perkins, said lands belong to Stoddard county and ought to be sold by the county and the revenue arising therefrom applied as directed by the statute. It is further considered and adjudged by the court that justice demands that those parties having a bona fide chain of title coming down through the Ringer sale, ought to have the preference in the sale of said lands. It is therefore ordered by the court that all parties holding the Ringer title to said lands be and are hereby given until the first Monday in November, 1898, to come on and make application to the court for the purchase of any of such lands which they may hold under and by virtue of the Ringer sale at the price and sum of one dollar and twenty-five cents per acre, on such terms as the court by order of record may direct, and that all of said lands that shall remain unsold after the first

Monday in November next, will be offered for sale to the general public as other lands of the county are now sold, and that the holders of the Ringer lands be notified of this action of the court by the publication of this order in the Bloomfield Vindicator, and that all parties desiring to make application for the purchase of any such lands should apply to Ralph Wammack of Bloomfield, Missouri, who is hereby constituted agent of the county in the settlement of the title to said lands.' ''

Afterwards on September 14, 1898, these suits were instituted.

The petition, which is very voluminous, sets out at length plaintiff's chain of title, the facts aforesaid in detail, and further alleges in substance, that the Ringer judgment was upon county warrants issued for work and labor done under a contract made with the county court of said county, for the construction of certain ditches, dikes and levees, for the purpose of reclaiming said lands, whereby it was agreed that payment therefor would be made by warrants on the swamp land fund of said county, and thereupon it was represented by said county court that such warrants would be paid on presentation to the county treasurer, the custodian of the swamp land fund. That the same having been presented to the county treasurer and payment thereof refused, the said Ringer, being the assignee and holder of said warrants, instituted the suit thereupon in which said judgment was rendered. That since the conveyance by the sheriff's deed aforesaid, and the issue of the patents aforesaid by commissioner Eltzroth, the lands claimed in this controversy have been assessed to and the taxes paid by the plaintiffs and their grantors. That they have been in the continuous, open, notorious and adverse possession thereof for more than ten years before the institution of this suit, and that for more than twenty-nine years they and their grantors have exercised all such acts of ownership and control over said lands as their condition permitted, during which

time their right thereto was not questioned by the county. That the claim set forth in said order of the county court of April 16, 1898, is a cloud upon plaintiff's title; that defendant by the facts aforesaid is *estopped* and by its *laches* is precluded from setting up or maintaining any claim to said lands. Wherefore plaintiffs pray that the title to said lands be vested in them, that the defendant be forever enjoined from asserting any claim thereto, or interfering in any manner with plaintiffs' possession thereof, etc., and for general relief. The parol evidence, so far as is necessary, will be noticed later in the course of the opinion. From decrees in favor of the plaintiffs in accordance with their prayers, the defendant appeals.

"At the time this suit was instituted there was pending in this court on appeal an action in which this same title was involved, and which was thereafter passed upon in Division One, June 30, 1900 (State ex rel. Public Schools of Stoddard County v. Crumb, 157 Mo. 545), in which, after summarizing the statute governing the subject, it was held that, 'The plan, scheme and policy of the act was to vest the title to the lands in the county for the purpose of drainage, reclamation and sale, or sale without drainage or reclamation, the proceeds to go to the school fund; to authorize the county court to have the lands drained, reclaimed and surveyed under the direction of a commissioner and to give power to the county to raise money for this purpose by borrowing money and issuing bonds; to have the land sold by the sheriff, at public vendue, on sixty days' notice, but not for less than one dollar and twenty-five cents an acre within five years from January 1, 1866; and to require the net proceeds of such sale after deducting the expenses of draining, reclaiming, surveying and selling the same, to be paid into the county treasury and become a part of the public school fund of the county, and to be loaned out like other school funds, and only the interest arising therefrom to be apportioned

and distributed like other school funds.    The act was
approved March 27, 1868.    Ringer obtained judgment
on March 13, 1868.    The sheriff sold the land under
execution on September 16, 1868. The judgment, there-
fore, antedated the approval of the act, but the sale
under execution was after the act took effect.    The
judgment was a general judgment against the county.
.  .  .    The sheriff, therefore, sold these lands, which
the State conveyed to the county for the benefit of the
school fund, to satisfy a general judgment against the
county.    Such a sale was without authority of law and
conveyed no title to the purchaser.    Such lands were
exempt from such a sale for ordinary county indebted-
ness.    [State ex rel. v. Co. Ct. New Madrid Co., 51
Mo. 82.]    The property held by a person in trust can
not be sold under legal process to satisfy a personal
judgment for a personal debt of the trustee.    The effect
of the sale was to make the school lands pay $1,136.90
of the general indebtedness of the county and this could
not lawfully be done.    [Montgomery Co. v. Auchley,
103 Mo. 492.]    The sheriff's deed should therefore be
cancelled as a cloud upon the title to the lands.

" 'But defendants rely also upon the patents issued
by the county, through its special commissioner, on May
1, 1869.    Prior to the passage of the act of March 10,
1869, the patents for all such lands sold by the county
courts, were issued by the Governor, countersigned by
the Secretary of State, and registered in the office of
Register of Lands.    [Laws 1868, p. 69, sec. 4.]    The
sixth section of the Act of 1869 (Laws 1869, p. 64, sec.
6) authorized the county courts to issue the patents to
such lands and to sell and dispose of such lands like
any other real estate belonging to the county.    But this
act has been held by this court not to destroy the trust
created by the Act of 1868, and not to vest absolute
ownership of such lands in the county.    [State ex rel.
v. Co. Ct. New Madrid Co., 51 Mo. 1. c. 85; Sturgeon
v. Hampton, 88 Mo. 203; C. G. S. W. Railroad Co. v.

Hatton, 102 Mo. l. c. 55; St. L., C. G. & F. S. Railroad Co. v. Wayne Co., 125 Mo. 351; Hooke v Chitwood, 127 Mo. 372; State ex rel. v. Wayne Co. Ct., 98 Mo. l. c. 366.]

"'The Act of 1869 did not therefore divest or destroy the trust upon which the county held the land, nor did it change the manner of selling the same, nor remove the limitation as to selling for less than one dollar and twenty-five cents per acre within five years after January 1, 1866. Its only effect was to authorize the county to issue the patent instead of having it issued by the State.

"'When, therefore, the county court by its order of April 23, 1869, ordered these lands to be conveyed by a commissioner to the purchasers at the execution sale under the Ringer judgment, in consideration of $13,500 "in Stoddard county warrants, or, at the option of the purchasers, in cash, one-half payable January 1, 1870, and the other half January 1, 1871," it acted wholly without authority of law. As before shown, these lands could only be sold at the time by the sheriff, at public vendue, on sixty days' notice, for not less than one dollar and twenty-five cents an acre, by order of the county court. The proceeds were required to go to the school fund. The county court had no power to authorize them to be sold for $13,500 "in Stoddard county warrants." That they were so paid for is prima facie shown by the fact that the commissioner's deed was dated May 1, 1869, which could not have been the case if the purchasers had elected to pay in cash, one-half on January 1, 1870, and the other half on January 1, 1871. These inherent infirmities in these patents and want of power of the county court were known to the purchasers, for they knew the law and knew the power of the court under the law.

"'It is clear that the trust ran with the land, not only from the statutory provisions quoted, but from the decisions of this court from the case of State ex rel. v.

Co. Ct., 51 Mo. 82, down to St. L., C. G. & F. S. Railroad Co. v. Wayne Co., 125 Mo. 351, and from the provisions of section 8042, Revised Statutes 1889, which contemplate that such a suit as this shall be brought to recover lands, and from section 8040, Revised Statutes 1889, which makes it the duty of the State Board of Education to ascertain and sue for lands which have been used for purposes other than those named in the grant or intended by law. It is equally well decided in this State that in selling these swamp lands the county court is not the general agent of the county, but is a special agent invested with only the powers prescribed by the act granting these lands to the counties and that all persons dealing with the county court in respect to these lands are charged with notice of its power. [Sturgeon v. Hampton, 88 Mo. 211; C., G. S. W. Railroad Co. v. Hatton, 102 Mo. l. c. 55; State ex rel. v. Wayne Co. Ct,. 98 Mo. l. c. 366; St. L., C. G. & F. S. Railroad Co. v. Wayne Co., 125 Mo. 351; Hooke v. Chitwood, 127 Mo. l. c. 377.] The case of Pool v. Brown, 98 Mo. 675, holds that the trust is a personal one as to the State, but that as to the county the trust runs with the land, and that the Acts of 1869 and 1868 do not destroy the trust and remove the limitations upon the county as to the manner of selling these lands and the price for which they might be sold, and therefore there is no conflict between that case and the prior and subsequent decisions of this court on these questions.

" 'The circuit court therefore erred in not cancelling the patents issued by the county court through its commissioner. . . . It is only necessary to add that the plaintiff's rights are not barred by limitation. [Sec. 6772, R. S. 1889.] Neither is there any laches in the case, nor is the case, from its very nature, susceptible of being controlled by the doctrine of laches.'

"While the case of Stone v. Perkins, 85 Fed. 616, was an action in ejectment and the legal title to the land under the sheriff's deed and patent aforesaid only was

passed upon, the case of State ex rel. Public Schools of Stoddard County v. Crumb, 157 Mo. 545, was a suit in equity to set that title aside as a cloud upon the title of the county as trustee of the public schools of said county.   In these cases the whole subject has been so thoroughly and recently discussed, that it is unnecessary to go over the ground again.    The conclusions therein reached, that the title under which defendants claim, has no standing either in a court of law or a court of equity is so clearly demonstrated as to be decisive of the present case, unless a different conclusion is warranted by the additional facts disclosed by the record in this case, and to these additional facts only need our attention be directed.

"The effect of the recital, 'whereas at the March term, A. D., 1868, of the circuit court of Stoddard county in the State of Missouri, Louis M. Ringer obtained a judgment against Stoddard county upon warrants on the swamp land fund of said county,' etc., in the order of the county court of April 23, 1869, on the judgment, was not directly passed upon in State ex rel. v. Crumb, 157 Mo. 545, for the reasons stated in the opinion on page 561, and on the trial of this case the plaintiffs after showing that all of the original 'files' in the case of Ringer v. Stoddard County had been destroyed, introduced two witnesses who had seen the files before they were destroyed (some twenty or thirty years before), the evidence of one of whom tended to prove that the suit in which said judgment was rendered was based entirely on a number of certificates signed by James Cooper, superintendent of public works of Stoddard county, called 'county script' or 'swamp land script,' and of the other that the suit was based partly on such script and partly on county warrants, and the defendant introduced one witness, who examined the files at the time of the sale, and who testified that the suit was on two county warrants on the general revenue fund of the county.   The parol evidence also tended to

prove that about the time of the institution of the suit against the county, Ringer was the holder by assignment of some of such script or certificates amounting to the sum of twelve or thirteen hundred dollars. That they were issued in the year 1858 or 1859 for work done in Stoddard county in constructing a road called Bloomfield & New Madrid plank road, in doing which it became necessary to dig ditches, erect bridges and make a levee about three miles long, from a foot and a half to eight feet high. It would seem to go without saying, that neither the misrecital of the judgment in the order of the county court, nor this parol evidence affects said judgment in any manner. Whatever the cause of action may have been upon which it was rendered, that cause of action was merged in the judgment. It was a general judgment against the county by its terms, imports absolute verity, is impervious to collateral attack, and even if there was a mistake, *on such evidence,* it could not be changed, altered or corrected even in a direct proceeding for that purpose. [Board of Relief C. P. Church v. Drummond, 167 Mo. 54, and cases cited.] It may be remarked, however, that as appears from this evidence, Stoddard county had no swamp land fund, and under the law in force in that county at that time, the only right Ringer, as the holder of such certificates, had *quoad* the swamp lands in such county, was with them to enter or purchase such lands to the amount of such certificates at the price of one dollar per acre (Laws 1854-5, p. 154), and it is upon this shadowy foundation that it is sought by this parol evidence to set up an equity by which the character of the judgment under which the defendants claim, is to be changed, and the beneficiaries of this trust deprived of 107,000 acres of land, set apart for them by the State and the General Government. Such a claim could have no standing in a court of equity, even if defendants were not precluded from setting it up by the well-settled principles of law which makes such judgment a finality as to them.

And the ruling as to the character and effect of the judgment in this case must be the same as it was in the Crumb and Stone cases. These lands are not and never were the property of the county, or subject to its obligations as a county, and could not be subjected to them by a judgment against the county, nor could the county court trade them off for the obligations of the county, as was attempted by the order of the county court of April 23, 1869, and the patents issued in pursuance thereof.

"As to these lands the county was a mere trustee, and the county court and the other officers of the county were mere agents, for their disposition, in the manner and for the purposes designated by law, whose powers were defined and limited by law, and whose acts beyond the limits of such powers were void. Of those limitations the defendants and their grantors were required to take notice, and hence they acquired no title to the lands in question under the sheriff's deed aforesaid, or under the patents issued in pursuance of the order of the county court aforesaid. I. support of which conclusion, we deem it sufficient to cite the cases: State ex rel. Pub. Schools v. Crumb, 157 Mo. 545; Stone v. Perkins, 85 Fed. 616; Hooke v. Chitwood, 127 Mo. 372; St. L., Cape G. & Ft. Smith Ry. Co. v. Wayne Co., 125 Mo. 351; Wm. Brown Est. v. Wayne Co., 123 Mo. 464; Butler v. Sullivan Co., 108 Mo. 630; Cape G. & S. W. Ry. Co. v. Hatton, 102 Mo. 45; Sturgeon v. Hampton, 88 Mo. 203; Saline Co. v. Wilson, 61 Mo. 237; State ex rel. Robbins v. County Court, New Madrid, 51 Mo. 83; State v. Bank, 45 Mo. 528.

"The plaintiffs acquired no title by the statute of limitations. The doctrine of laches is not applicable to it, nor is the defendant estopped from asserting its title as trustee to these lands for the purposes of the trust, by reason of the fact that for more than twenty-nine years they have been paying the taxes assessed

against these timber lands of which during that time they have been in the profitable enjoyment. [R. S. 1889, sec. 6772; State ex rel. v. Crumb, 157 Mo. l. c. 564; Hooke v. Chitwood, 127 Mo. l. c. 377; Wheeler v. City of Poplar Bluff, 149 Mo. 36; State ex rel. v. Murphy, 134 Mo. 548; Heidelberg v. St. Francois Co., 100 Mo. 69; Sturgeon v. Hampton, 88 Mo. 203; City of St. Louis v. Gorman, 29 Mo. 593.] The plaintiffs having therefore failed to make good their claim to these lands upon any of the grounds set forth in their petitions, the circuit court erred in rendering the decrees aforesaid in their favor, and the same should be reversed. But, at the last session of the General Assembly, by an act approved March 14, 1901 (Laws 1901, p. 202), section 8197 of article 3, chapter 122, Revised Statutes 1899, entitled 'Swamp and Overflowed Lands,' was amended by adding at the end of said section the following proviso: 'Provided, further, that in all cases where the county courts of the State have, prior to 1880, sold or disposed of any such swamp lands in their respective counties and issued, or caused to be issued, patents for the same, and the patentees, or those holding under them, have been claiming such lands and paying county and State taxes thereon for more than twenty years, such grants shall be deemed and held to be good and valid, and no action shall be maintained for the purpose of setting aside or calling in question such patent or patents.'

"At the time this act was passed and went into effect these cases had been tried and finally determined in the circuit court and were pending in this court on appeal. The jurisdiction of this court over them is purely appellate, in the exercise of which we are confined to a review of the case as it was tried below. No new issue can be injected into the cases in this court. Moreover, this statute does not purport to give a cause of action, or to give aid to one, but only to bar an action 'for the purpose of setting aside or calling in question

such patent or patents.' Hence, it can not be invoked in these cases in aid of the decree herein rendered, and we refrain from expressing any opinion upon it. The decrees and the judgments in these cases will therefore be reversed.''

In this opinion, *Robinson, C. J.,* and *Marshall, J.,* still concur.